713 So.2d 742 (1998)
Richard BRASSEAUX, et ux., Plaintiffs-Appellees/Appellants,
v.
The TOWN OF MAMOU, et al., Defendants-Appellants/Appellees.
No. 97-1540.
Court of Appeal of Louisiana, Third Circuit.
May 20, 1998.
*745 Jeffrey Michael Bassett, Opelousas, for Richard Brasseaux, et al.
John Fayne Wilkes, III, Lafayette, for Town of Mamou, et al.
Anthony Craig Dupre, Ville Platte, for Keith Lavergne.
William Tracy Barstow, Opleousas, for Shannon Bordelon.
Jacque Berchmans Pucheu, Jr., Eunice, for Tri-Parish Bank.
Before DOUCET, C.J., and SULLIVAN and GREMILLION, JJ.
GREMILLION, Judge.
In this case, the defendants, the Town of Mamou and Keith Lavergne, appeal the judgment of the trial court finding them, along with Shannon Bordelon, liable for the damages suffered by the plaintiff, Richard Brasseaux, in an incident at a bar owned by him. Brasseaux and his wife also appeal the trial court's judgment. For the following reasons, we affirm.

FACTS
Brasseaux, the owner/operator of the Four Aces Lounge in Eunice, was injured in an altercation which took place outside the lounge in the early morning hours of March 5, 1995. Lavergne, a part-time dispatcher for the Mamou Police Department, arrived at the Four Aces with Bordelon around closing time. The incident at issue arose when Brasseaux was hit over the head with a stick while trying to protect one of his patrons from further injury at the hands of Bordelon. Bordelon had evidently argued with J.B. "George" Stelly over a pool game and followed him and his "common-law" wife, Florance Johnson, outside. When Bordelon hit Stelly with a pool stick, Johnson cried out attracting the attention of Brasseaux, who went outside with his "nightstick," a modified axe handle. At some point, Lavergne went outside and flashed his badge, telling Brasseaux that he was a police officer and that he had everything under control. While Brasseaux was questioning Lavergne about his jurisdiction in Eunice, Bordelon struck him from behind in the neck/shoulder region with his pool stick. Brasseaux was struck a second time on the top of the head, with either the pool stick or nightstick, by either Bordelon or Lavergne. Bordelon and Lavergne left the scene before the arrival of an officer from the St. Landry Parish Sheriff's Office. Brasseaux was transported to the Moosa Memorial Hospital and from there to Lafayette General Hospital where he remained hospitalized for several days with a closed head injury.
Brasseaux and his wife, Cheryl, eventually filed suit against Mamou, Lavergne, and Bordelon. They alleged that Mamou was liable for its negligent hiring of Lavergne and in failing to properly supervise and train him. They further alleged that Mamou was vicariously liable because Lavergne was acting within the course and scope of his employment.
All of the defendants denied liability, and Mamou filed a cross-claim against Bordelon seeking indemnity and/or contribution in the event that it was held liable to the Brasseauxs. A petition of intervention was filed *746 by Tri-Parish Bank, seeking to have a prior judgment of default against Brasseaux recognized.[1] Mamou filed a motion for summary judgment alleging that Lavergne was not within the course and scope of his employment, either as a patrolman or a dispatcher, when Brasseaux was injured. This motion was denied. Writ applications were taken by Mamou to this court and to the supreme court, both of which were denied.
A bench trial was held in this matter and, after taking the matter under advisement, the trial court issued written reasons for judgment finding that Bordelon, Lavergne, and Mamou were liable for the damages sustained by Brasseaux. The trial court apportioned the fault of the parties at fifty percent to Bordelon and fifty percent to Lavergne and Mamou, and awarded Brasseaux $250,000.00 for his closed head injury and resulting condition, $125,000.00 for the aggravation of his pre-existing asymptomatic herniated cervical disc at the C5-6 disc level, $100,000.00 for loss of earning capacity, and $74,675.04 for past and future medical expenses. Cheryl was awarded $25,000.00 for her loss of consortium. The trial court also held that the Brasseauxs failed to prove that Brasseaux's carpal tunnel syndrome and diabetes were causally related to this incident. A judgment was signed on August 8, 1997. Mamou and Lavergne appeal suspensively from this judgment. The Brasseauxs also appeal.

ISSUES
On appeal, Mamou asserts nine assignments of error:
1) The trial court erred when it found that Lavergne was a police officer for Mamou at the time of Brasseaux's injuries.
2) The trial court erred when it found that Lavergne was in the course and scope of his employment with Mamou during the altercation at the Four Aces Lounge in Eunice, Louisiana on March 5, 1995.
3) The trial court erred when it assessed fifty percent fault to Lavergne and Mamou and failed to assess one hundred percent fault to Bordelon.
4) The trial court erred when it found that Brasseaux was not contributorily or comparatively negligent for the injuries he received on March 5, 1995.
5) The trial court erred when it did not allow Mamou's proffers 1, 2, 3, 4, 5, and 6 into evidence.
6) The trial court erred in awarding Brasseaux general damages in the amount of $250,000.00 for a head injury.
7) The trial court erred in awarding Brasseaux general damagers in the amount of $125,000.00 for aggravation of a pre-existing asymptomatic herniated cervical disc.
8) The trial court erred when it awarded Brasseaux damages in the amount of $100,000.00 for loss of earning capacity.
9) The trial court erred when it awarded Cheryl $25,000.00 in loss of consortium.
The Brasseauxs argue that three errors were committed by the trial court:
1) The trial court erred in failing to find Lavergne, Bordelon, and Mamou solidarily liable for their actions.
2) The trial court erred in awarding only $250,000.00 to Brasseaux for his head injury.
3) The trial court erred in refusing to award Brasseaux damages for carpal tunnel surgery and diabetes.
In his brief, Lavergne merely adopted portions of Mamou's assignments of errors and certain responses by the Brasseauxs to Mamou's arguments.

MAMOU

Assignment of Error Number One
In its first assignment of error, Mamou argues that the trial court erred by finding that Lavergne was a police officer at the time Brasseaux was injured. Even if Lavergne was allowed to participate in on-the-job training, it claims there was insufficient evidence to prove that he was, in fact, a police officer.
Lavergne testified that he was hired by Mamou at the end of 1994 to work in the *747 town's street department. However, in early 1995, he was offered the job of part-time dispatcher with the Mamou Police Department. Shortly thereafter, with the consent of Greg Dupuis, the Chief of Police, he began training as a police officer on a voluntary basis. Lavergne stated that he was issued a uniform, a duty belt, a badge, a commission card, and handcuffs. He even purchased a revolver and, testified that prior to doing so, he discussed which type or size to buy with Chief Dupuis. He testified that he rode with several officers to obtain training, and that he was in full uniform and carrying a gun while doing so. He stated that he patrolled on foot during Mardi Gras before this incident, during which he participated in an arrest. Lavergne testified that he was allowed to patrol by himself on one occasion in a patrol car while in uniform and carrying a gun. He further stated that he assisted in filling out an accident investigation report and signed his name to the report. Lavergne testified that he was allowed to place handcuffs on his own brother, who was picked up for questioning. On that occasion, his brother was picked up outside of the town's limits for something which had occurred within them.
Lavergne testified that he was a part-time dispatcher and part-time police officer. However, he admitted that he was only compensated while working as a dispatcher and not while riding with the officers. His commission card stated that he was a dispatcher, not a patrolman. Lavergne indicated that he had no firearm training, academy training, or crowd control training, and that he had never read a police manual.
Chief Dupuis testified that Lavergne was hired as a part-time dispatcher. When Lavergne came to him with aspirations of being a police officer, Chief Dupuis stated that he told him there were no openings but that he could ride with the other officers on a voluntary basis. Although he approved of this, Chief Dupuis was unaware and did not approve of Lavergne carrying a gun while doing so. He admitted that dispatchers are not issued belts and handcuffs, and they do not patrol, fill out accident reports, or make arrests. However, he testified that he authorized Lavergne to patrol in uniform, with a badge and a gun, during Mardi Gras, and was aware that he assisted in an arrest that day. Chief Dupuis stated that had he hired Lavergne as a patrolman, he would have taken him off of the radio and trained him full-time as a patrolman, given him a gun, commissioned him as a patrolman, and put him on the schedule to patrol within three to four weeks. He further stated that he would have sent Lavergne to the police academy as soon as possible so he could become post-certified. Chief Dupuis' testimony was tracked by that of Herman Celestine, the assistant chief of police. Celestine added that he issued a duty belt to Lavergne a few days prior to Mardi Gras.
Felisha Danielson, a former dispatcher for the Mamou Police Department, testified that the duties of a dispatcher included answering the phone, handling radio calls and walk-ins, and taking complaints. She stated that she was unaware of any other dispatcher going on training rides, investigating accidents, or patrolling in a patrol car on their own. She testified that Lavergne was the only dispatcher to patrol during Mardi Gras in full uniform.
The trial court held that Lavergne was a police officer because he had a gun, a badge, a uniform, a gun belt, handcuffs, and an ID card. It further found that he was allowed to participate in making arrests, accident investigation, and that he patrolled in uniform while carrying a gun, on foot for Mardi Gras, and, on one occasion, alone in a patrol car. Based on this evidence, the trial court was satisfied that Lavergne was a police officer for Mamou at the time of Brasseaux's injuries.
Under the appellate standard of review, we will only reverse the trial court's findings of fact if, after reviewing the record in its entirety, we find that a reasonable factual basis does not exist for those findings, and the record establishes that they are clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). The trial court's determination that Lavergne was a police officer for the Mamou Police Department is a finding of fact which is supported by the record. Accordingly, since a reasonable factual *748 basis exists for this finding, we will not upset the trial court's finding. This assignment of error is without merit.

Assignment of Error Number Two
In its second assignment of error, Mamou argues that the trial court erred in finding that Lavergne was in the course and scope of his employment as a police officer during the altercation at the Four Aces Lounge on March 5, 1995. Mamou states that Lavergne was not on duty or scheduled to go back to work, that he was not on twenty-four hour call, was not being paid, was outside of the city limits of Mamou, did not have on his uniform, and had been drinking for approximately five hours prior to arriving at the Four Aces. Mamou further argues that Lavergne testified that he did not intend to arrest anyone when he showed his badge, he only intended to disperse the crowd.
An employer will be vicariously liable for the tortious acts of his employee if the acts occurred while the employee was in the course and scope of his employment with the employer. This liability arises pursuant to La.Civ.Code art. 2320, which states that "[m]asters and employees are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." The determination of whether an employee is within the course and scope of his employment is a question that is only answerable by general rules, because of the unending contexts in which the question may arise. Orgeron v. McDonald, 93-1353 (La.7/5/94); 639 So.2d 224.
In order for an employer to be vicariously liable, the tortious acts of the employee must be so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest. LeBrane v. Lewis, 292 So.2d 216 (La.1974). The court in LeBrane listed four factors which should be considered in finding an employer vicariously liable for the acts of its employee:
1) Whether the tortious act was primarily employment rooted;
2) Whether the violence was reasonably incidental to the performance of the employee's duties;
3) Whether the act occurred on the employer's premises; and
4) Whether it occurred during the hours of employment.
Id. It is not necessary for all of these factors to be present in order to find an employer vicariously liable. Maze v. Grogan, 96-1413 (La.App. 1 Cir. 5/9/97); 694 So.2d 1168. However, at least one of these factors must be present for the employer's liability to attach. Washington v. Reed, 624 So.2d 465 (La.App. 2 Cir.1993).
The particular facts of each case must be analyzed to determine whether the employee's tortious conduct was within the course and scope of his employment. Baumeister v. Plunkett, 95-2270 (La.5/21/96); 673 So.2d 994. Further, the trial court's finding with regard to whether an employee's actions were within the course and scope of his employment is a finding of fact, which will not be reversed in the absence of manifest error or unless it is clearly wrong. Id., Stobart, 617 So.2d 880.
In its written reasons, the trial court admitted that the facts of this case failed to satisfy the last two LeBrane factors since Lavergne's actions did not occur on Mamou's premises and did not take place during his hours of employment. However, the trial court determined that Lavergne's conduct was primarily employment rooted and was reasonably incidental to his duties with Mamou, thus it was vicariously liable for his actions. The trial court deduced from Lavergne's testimony that he believed he was a police officer for Mamou and that he felt he could handle the situation which arose at the Four Aces involving Bordelon and Brasseaux. The trial court stated:
Once involved, the only way Lavergne could possibly get out of the situation was to draw on his background, i.e., the authority, power, respect and discipline of the law which he presumably derived as a police officer with the Town of Mamou. The only *749 place or way Lavergne could have gotten the idea that he was a police officer with apparent authority to do what he did was his employment with the Town of Mamou and his prior performance as a dispatcher and quasi police officer. There is no other evidence to the contrary. Hence, Lavergne's tortious conduct was primarily employment rooted and reasonably incidental to the performance of his employment duties with the Town of Mamou. This is exactly what you would expect to happen when you hire an inexperienced, untested and untrained person to perform (or be allowed to perform) the extremely difficult job of a policeman.
We agree with the trial court that Lavergne's tortious conduct occurred while he was in the course and scope of his employment with Mamou. Although there is no evidence proving the last two LeBrane factors, we have already stated that it is not necessary for all four factors to be proven.
Lavergne testified that after following Brasseaux outside he saw Bordelon and Brasseaux facing each other, each with a raised stick in their hands. At that time, Lavergne stated that he pulled his badge out of his pocket and announced that he was a police officer. Although he did not witness it, Lavergne testified that Bordelon then hit Brasseaux with his pool stick. While Brasseaux was bent over from this blow, Lavergne testified that he panicked and kicked him in the right hip in an effort to knock the nightstick out of his hand. When asked by someone in the crowd which police department he worked for, Lavergne replied that he worked for the Mamou Police Department. When he turned back towards Brasseaux, Lavergne stated that he was down on the ground. He testified that he assumed Bordelon had hit him again. He said that they left the scene shortly thereafter.
Lavergne claimed that he acted as he did in an attempt to prevent Bordelon and Brasseaux from fighting. In his deposition, he stated that he used his badge to exercise his authority as a police officer for crowd control. At the trial, he admitted that he used the symbol of his badge to calm the crowd outside the Four Aces.
It is reasonably foreseeable that an off-duty police officer, who is out of his jurisdiction, will become involved in a situation such as this and will attempt to secure the scene by brandishing his badge and announcing his status as a peace officer. Prior cases have held that police officers, although off-duty or out of their jurisdiction, were within the course and scope of their employment when they committed their tortious actions. See Johnson v. Gantt, 606 So.2d 854 (La.App. 2 Cir.), writ denied, 608 So.2d 196 (La.1992) and Lamkin v. Brooks, 498 So.2d 1068 (La. 1986). In Roberts v. Benoit, 605 So.2d 1032, 1037 (La.1991), the supreme court recognized that, under the common law, "a municipal employer has been held vicariously liable for the tortious acts of its deputy when the deputy, albeit technically `off duty,' is acting within the scope of his employment." This is reasonable to foresee considering that one of the duties of police officers is to maintain the peace. Miller v. Bailey, 621 So.2d 1174 (La. App. 3 Cir.) writ denied, 629 So.2d 358 (La. 1993). Even Chief Dupuis and Assistant Chief Celestine testified that their deputies are instructed to secure the scene and contact the local authorities if they observe a crime committed outside of their jurisdiction. Chief Dupuis stated that showing a badge and identifying yourself as a police officer is the proper procedure for securing the scene. Thus, we find that the trial court correctly held that Lavergne's actions were reasonably incidental to the performance of his duties with Mamou.
The final LeBrane factor requires a finding that the tortious act was primarily employment rooted. In Ermert v. Hartford Ins. Co., 559 So.2d 467, 477 (La.1990) (citations omitted), the supreme court stated:
The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. So also, the act may be found to be in the service if not only the manner of acting but *750 the act itself is done largely for the servant's purpose.
Lavergne testified that he flashed his badge and announced that he was a police officer in order to prevent Brasseaux and Bordelon from fighting. Maintaining the peace is a duty of a police officer and the business of Mamou. By attempting to maintain the peace, we find that Lavergne's actions were primarily employment rooted. Accordingly, the trial court's finding that Lavergne was acting within the course and scope of his employment was reasonable. This assignment of error is dismissed.

Assignment of Error Number Three
In its third assignment of error, Mamou argues that the trial court erred in assessing it and Lavergne with fifty percent of the fault instead of allocating the entire fault to Bordelon. Mamou argues that the trial court erred by crediting the testimony of Johnson and Aucoin over that of Bordelon, who testified that he, and not Lavergne, was the only person to hit Brasseaux. Mamou points out inconsistencies in the testimony and statements of both Johnson and Aucoin in support of its argument. It further argues that the trial court's application of the duty/risk analysis was manifestly erroneous because it relied solely on the finding that Lavergne was a police officer. Having found no error in that finding, we need not address this last argument.
A trial court's determination and allocation of fault are factual findings which are subject to the manifest error clearly wrong standard of review. Adkinson v. Brookshire Grocery Co., Inc., 95-1021 (La. App. 3 Cir. 1/31/96); 670 So.2d 453, writ denied, 96-514 (La.4/8/96); 671 So.2d 339.
Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"
Stobart, 617 So.2d at 882-3.
In its reasons for judgment, the trial court stated that Lavergne was free from fault until he became involved in the incident at issue. Although it could not accurately determine the degree of Lavergne's involvement due to the inconsistent statements and credibility or lack of credibility of the witnesses or actors, the trial court found that he was present and involved in the events leading up to Brasseaux's injuries. Once he flashed his badge and announced his status as a police officer, Lavergne's duty was to secure the scene and contact the local authorities. The trial court held that all Lavergne had to do to secure the scene was remove Bordelon from the area. Instead, Lavergne panicked and kicked Brasseaux. The trial court found it important that Lavergne interceded in the altercation before Brasseaux suffered the final blow to his head. In finding that he failed to secure the scene or contact the authorities, the trial court held that Lavergne's "actions constituted a joint cause-in-fact and proximate or legal cause, together with Bordelon's actions, resulting in serious injury to Brasseaux."
After reviewing the record, we agree with the trial court that it is difficult to ascertain the part Lavergne played in this incident. We also agree with Mamou that Johnson's and Aucoin's statements and testimonies contain inconsistencies. However, there are greater inconsistencies in the statements and especially the testimonies of Bordelon and Lavergne. This was obviously a case where the trial court decided that, although inconsistent, Johnson and Aucoin were more credible than Bordelon and Lavergne. Since this *751 is within the province of the trial court, we cannot say that it erred in doing so. With regard to the allocation of fault, the record supports the trial court's finding that Lavergne was involved in the incident, that he interceded before Brasseaux was severely injured, and that he failed to secure the scene or contact the local authorities. Because the allocation of fault is a finding of fact, we will not reverse the trial court's finding in the absence of error. Finding no error, we affirm.

Assignment of Error Number Four
In its fourth assignment of error, Mamou claims that the trial court erred by failing to find Brasseaux contributorily or comparatively negligent in causing his injuries. It claims that, although a business establishment owes a duty to its patrons to exercise reasonable care in protecting them from injury, this duty does not extend to unforeseeable or unanticipated acts by independent third persons.
We disagree with Mamou's interpretation of the duty Brasseaux owed to his patrons. A business owner has a duty to provide his patrons with a reasonably safe place. Included in that duty is the business owner's obligation to protect his patrons from harm at the hands of an employee, another guest, or a third party. Dundas v. Real Superstore, 94-979 (La.App. 3 Cir. 2/1/95); 650 So.2d 402, writ denied, 95-470 (La.4/28/95); 653 So.2d 590. Since the allocation of comparative fault is a finding of fact, it is reviewed under the manifest errorclearly wrong standard of review. Stobart, 617 So.2d 880.
The trial court found that Brasseaux's actions were justifiable considering his status as a bar owner/operator and the situation facing him. It held that Brasseaux did not cause, provoke, or instigate the altercation, but, instead was the victim due to his attempt to "keep the peace in his establishment and protect his patrons." It further found that there was no testimony, other than Bordelon's, that Brasseaux threatened anyone with his nightstick.
After reviewing the record, we perceive no error in this finding. This assignment of error is dismissed.

Assignment of Error Number Five
In its fifth assignment of error, Mamou alleges that the trial court erred by refusing to introduce into the record evidence dealing with the criminal aspect of this matter. Mamou made six different proffers. We will address each one separately.
Proffer number one was a letter from Brasseaux's attorney to the district attorney concerning a visit by officers of the Mamou Police Department to the Four Aces Lounge following the incident at issue. This letter was contained within the St. Landry Parish District Attorney's file. The entire file was offered by Mamou in proffer number three.
The trial court is accorded vast discretion concerning the admission of evidence, and its decision will not be reversed on appeal absent an abuse of that discretion. Maddox v. Omni Drilling Corp., 96-1673 (La.App. 3 Cir. 8/6/97); 698 So.2d 1022, writ denied, 97-2766, 97-2767 (La.1/30/98); 709 So.2d 706. In this instance, the trial court ruled that the letter was inadmissible pursuant to La.Code Evid. art. 403. Article 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." In sustaining Brasseaux's objection to the introduction of the letter into evidence, the trial court held that Brasseaux's testimony was the best evidence as to what the letter concerned. We find no abuse of discretion in this ruling.
The second proffer concerned Mamou's attempt to introduce into evidence the entire investigation file of the St. Landry Parish Sheriff's Office. The trial court ruled that this was inadmissable pursuant to La. Code Evid. art. 803(8)(b)(i). That article provides that investigative reports by police or other law enforcement personnel are excluded from the exception to the hearsay rule pertaining to public records and reports. *752 Therefore, we find that the trial court was correct in its ruling.
The trial court also ruled that the entire file of the St. Landry Parish District Attorney's office was inadmissible because portions of it would be inadmissible as work product, attorney-client privilege, or under La.Code Evid. art. 410(A) or (B). This evidence pertained to Mamou's third proffer. Article 410 pertains to the inadmissibility of pleas, plea discussions, and related statements. We, likewise, find no abuse of discretion in this ruling.
Proffer number four was the transcript of Lavergne's motion to reconsider his sentence and the per curiam opinion with regard to that sentence. The trial court held that these were inadmissable because they were irrelevant. We agree.
Proffers number five and six were the plea transcript and sentencing transcript of Bordelon. The trial court held that they were not relevant pursuant to La.Code Evid. art. 803(22), which precludes evidence of a prior judgment when based on a plea of nolo contendere. Bordelon pled nolo contendere to the criminal charges against him, thus, the trial court correctly excluded this evidence.
For the foregoing reasons, Mamou's fifth assignment of error is dismissed. The trial court's rulings are affirmed.

Assignment of Error Number Six
In its sixth assignment of error, Mamou claims that the trial court erred in awarding Brasseaux general damages in the amount of $250,000.00 for his head injury. Although it admits Brasseaux suffered a closed head injury, Mamou argues that since it was impossible to accurately determine his pre-injury IQ, any injury suffered by Brasseaux must have been slight.
A trial court's finding of fact will not be reversed on appeal in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La. 1989). If there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the reviewing court feels that its own evaluations and inferences are as reasonable as those of the trial court. Id. If the trial court is presented with two views of the evidence, then the trial court's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). If a trial court's finding of fact were based upon a credibility determination, then the manifest error clearly wrong standard of review demands great deference to those findings. Rosell, 549 So.2d 840. This holds true even when the trial court's findings are based on an expert's testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990).
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994) (footnote omitted), the supreme court examined the standard of review appellate courts are to apply while reviewing a damage award:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art.1934(3)(1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar *753 to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons should frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Dr. Bernard Fruge testified in his deposition that when Brasseaux arrived at the Moosa Memorial Hospital, x-rays and a CT scan of his brain revealed a right parietal skull fracture with right epidural or subdural bleeding, right intracerebral bleeding with some mass effect of pressure on the right lateral ventricle, and a laceration on his head. He rated Brasseaux on the Glasgow Scale in terms of consciousness as a four-five. Under that scale, a rating of ten, eleven, and twelve indicates a minor head injury, while six, five, and four indicates a more severe head injury. Dr. Fruge transferred Brasseaux to Lafayette General Hospital, to be examined by a neurosurgeon.
Brasseaux was examined by Dr. Patrick A. Juneau, III, a neurosurgeon, at Lafayette General. He found that Brasseaux had suffered a left frontal scalp laceration down to the bone, but no depressed skull fracture, a right frontoparietal acute subdural hematoma less than one centimeter in size, and underlying contused brain. In his deposition, Dr. Juneau stated that Brasseaux had experienced intracranial pressure which resulted in his brain shifting to one side, and that he suffered a contrecoup injury, where he was hit on the left side of the head and experienced injury to the right side of his brain. Brasseaux was admitted into the hospital and placed in ICU for one day. He was discharged on March 8, 1995. When Brasseaux was seen for follow-up, he complained of headaches, irritability, generalized weakness, and dizziness. Dr. Juneau described the symptoms as part of post-concussive syndrome.
Brasseaux was examined by two neuropsychologists, Dr. William Gouvier and Dr. John Bolter. Both felt that Brasseaux suffered an injury to his brain and cognitive deficits as a result of the March 5, 1995 trauma, and neither felt that he was exaggerating his problems or malingering. Dr. Gouvier determined that Brasseaux had fairly significant memory deficits and evidence of attention and concentration deficits. He found clinical correlation for a finding of right hemisphere damage to the brain in the fact that Brasseaux's visual memory was worse than his verbal memory. In motor testing, Dr. Gouvier found that Brasseaux was slower, weaker, and less coordinated in the movements of his left hand than his right hand. He was aware that Brasseaux had a ruptured cervical disc, but stated that an injury to the right side of the brain could also cause weakness on the left side. Dr. Gouvier felt that more probably than not the weakness represented a *754 combined impact of Brasseaux's neck and brain problems.
Dr. Gouvier determined Brasseaux's Verbal IQ-79, Performance IQ-77, and Full Scale IQ-78 based on the North American Adult Reading Test (NAART), Based on these findings, he estimated that Brasseaux's pre-morbid Verbal IQ was 74 and his Performance IQ was 94, and determined his post-injury IQ was Verbal IQ-78, Performance IQ-77, and Full Scale IQ was 78. Dr. Gouvier felt that the higher degree of scatter among the performance scales than the verbal scales indicated brain dysfunction. This supported his contention that Brasseaux had probably lost Performance IQ points as a result of his injury. Dr. Gouvier testified that he expected Brasseaux's Performance IQ to be higher, based on his limited education.
Dr. Gouvier felt that some portion of Brasseaux's present cognitive status had been deleteriously affected as a consequence of his head injury, as quantified by his IQ. He found that Brasseaux's academic performance was below the first percentile in reading, writing, and arithmetic. He did not feel that Brasseaux could have obtained employment with the state if his skill levels were that low prior to the incident, thus, he suspected that Brasseaux had suffered a reduction in that area as a result of his injury. Dr. Gouvier testified that he thought it more probable than not that Brasseaux suffered a significant memory loss, and that his emotional and behavioral profile had also changed as a result of his injury. However, he admitted that a low educational background and drug and alcohol abuse could affect a person's test performance.[2] Dr. Gouvier did not feel that pre-existing problems, such as musculoskeletal problems and alcoholism would have affected Brasseaux's NAART test results, thus, he would not make any adjustments to the seventeen point deficiency between the post- and pre-Performance IQ results.
Dr. Bolter determined that Brasseaux has problems with constructional praxis problems; moderate problems with attention and concentration; severe problems with speed of mental processing; and moderate to severe memory retrieval problems. He stated that Brasseaux had more motor problems than sensory problems on his left side. In an IQ test administered by Dr. Bolter, Brasseaux's Verbal IQ was 86, Performance IQ was 82 and his Full Scale IQ was 84. He felt that these results were similar to the results of Dr. Gouvier's tests.
Dr. Bolter also examined Brasseaux's educational background. Brasseaux failed the first and fifth grade and quit school in the seventh grade at the age of fifteen. Dr. Bolter stated that he would not expect a person with this background to be functioning in the average range of intellect. He stated that he would expect this person to have specific language related problems, verbal learning related problems, and at risk of having attention and concentration difficulties.
Although both doctors agree that Brasseaux suffers from cognitive deficits, they disagree as to the cause of his deficits. Dr. Gouvier determined that Brasseaux experienced a significant diffuse cognitive decline as a result of his March 5, 1995 trauma. Dr. Bolter felt that Brasseaux had been impaired as a result of his brain injury. However, he stated that there were factors other than the trauma which could account for his difficulties, such as diabetes and alcohol abuse. Dr. Bolter further stated that the diffuse cortical atrophic changes in Brasseaux's brain revealed by the May 17, 1996 MRI, were not caused by the trauma, but could have been caused by diabetes or alcohol abuse. He stated that when there is evidence of cortical atrophy, he would expect to see impairment in the individual, especially in a male who has not yet reached his sixties or seventies.
Dr. Bolter stated that it was hard to quantify how much of Brasseaux's mental/memory problems were related to this trauma. He stated that he would expect Brasseaux to show more circumscribed findings than general findings due to the injury in the area of *755 his right posterior brain. Dr. Bolter testified that Brasseaux's difficulties with constructional praxis problems and motor loss in his left hand were consistent with the injury he suffered. However, he could not relate his problems with verbal and abstraction ability to the right posterior injury. He also felt that Brasseaux's problems with speed of processing and generalized swelling, although more of a general finding, could be related to the atrophy. Dr. Bolter further stated that taking Xanax can affect the test result by causing loss and slowing of thought.[3]
In awarding Brasseaux damages for his head injury, the trial court found that he suffered a serious blow to his forehead which resulted in a two and one-half inch laceration and an acute non-depressed skull fracture. It further found that he had been diagnosed with post-concussive syndrome and cognitive disorder. Although it found that the degree of Brasseaux's cognitive deficit was at issue, the trial court held that the medical evidence supported a finding that he suffered significant memory deficit, attention and concentration deficits, a diffuse cognitive decline, and emotional and behavioral changes. The trial court also found that Brasseaux suffered from headaches, depression, a partial loss of smell and taste, and suffered a degree of permanent-partial disability and economic impairment. As a result, the trial court awarded Brasseaux $250,000.00 in damages.
Following a review of the record, we cannot say that the trial court erred in finding that Brasseaux did suffer a head injury as a result of this incident. We agree with the trial court that there is a question as to the amount of cognitive deficits Brasseaux suffered as a result of his head trauma. However, the trial court was presented with evidence from two different neuropsychologists and chose to accept the testimony of Dr. Gouvier over that of Dr. Bolter. We cannot say that this choice was unreasonable in light of the evidence presented. Nor do we find unreasonable the amount of damages awarded. All of the doctors testified that Brasseaux suffered a closed head injury. Dr. Gouvier, and even Dr. Bolter, testified that Brasseaux has been impaired cognitively due to this injury. There was testimony from the witnesses that Brasseaux was in good health prior to March 5, 1995, but afterwards, his health had deteriorated, he was forgetful, moody, and he had lost his sense of smell and taste. Brasseaux testified that he now suffers from headaches, depression, a partial loss of sense of taste and smell, problems with his memory, and a decrease in the overall condition of his general health. Considering the evidence, we cannot say that $250,000.00 is beyond that which a reasonable trier of fact could assess for the effects of this head injury on Brasseaux. Finding no merit in this assignment of error, we affirm the trial court's award.

Assignment of Error Number Seven
In its seventh assignment of error, Mamou argues that the trial court erred in awarding Brasseaux general damages in the amount of $125,000.00 for aggravation of a pre-existing asymptomatic herniated cervical disc. Mamou claims that Brasseaux's condition is no worse today than it was in 1985 when he applied for social security disability benefits because he was suffering from back and knee pain. Thus, it argues that Brasseaux has failed to prove causation.
With regard to a pre-existing condition, the supreme court, in Lasha v. Olin Corp., 625 So.2d 1002, 1005-6 (La.1993) (citations omitted), stated:
The defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part of the consequences of the plaintiff's injury by the defendant. It is clear that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct.... When the defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation.
The evidence shows that Brasseaux was injured on July 22, 1983, when he was struck by a pair of tongs while working for Superior Casing. He was diagnosed as suffering from *756 a herniated disc at C5-6 and L4-5. On September 11, 1985, Brasseaux applied for social security disability benefits due to his back injury. One of his complaints was numbness in the middle three fingers of his left hand. Brasseaux's application for disability benefits was denied on November 18, 1985.
Dr. Juneau testified that the MRI of June 1, 1996, revealed a prominent protrusion at C5-6, median or paramedian in location. He stated that this protrusion had distorted or pushed the spinal cord over to the left. He further testified that a CT scan of July 17, 1996, revealed a prominent soft tissue protrusion at C5-6. He stated that the disc tended to span the whole region, and that calcification was located within the protruded disc material, indicating that the protrusion had been present for at least six months to one year. Dr. Juneau again pointed out that Brasseaux's spinal cord at this level was pushed over to the right by the disc protrusion. He felt that Brasseaux had a "big problem" at this level, and that he was "sitting on a time bomb" because of the position of the spinal cord. Dr. Juneau testified that Brasseaux was at risk of paralysis or further problems, and that he was a candidate for surgery because of the stenosis and distortion of the spinal cord. Dr. Juneau was of the opinion that the blows received by Brasseaux would likely have aggravated his pre-existing condition, and may have caused him to become more symptomatic.
Dr. Brian Bateman, an orthopedic surgeon, treated Brasseaux for neck and arm pain through the Charity Hospital System. Brasseaux complained of pain down his left arm and numbness in his radial three digits. Dr. Bateman stated that Brasseaux suffered from a double crush syndrome, which consisted of a herniated cervical disc at C5-6 and carpal tunnel syndrome in his left arm. Although the EMG and nerve conduction studies were positive for findings of carpal tunnel syndrome, Dr. Bateman testified that this did not mean that Brasseaux's problems were not caused by his cervical disc. He stated that they felt that Brasseaux had a fairly significant herniated disc and canal and nerve root compromise on the left side, so they scheduled him for an anterior cervical fusion in July 1996. However, following the MRI and CT, Dr. Bateman testified that the senior spine staff decided to perform the less invasive carpal tunnel release to try and relieve his symptoms. This procedure was performed in October 1996. Dr. Bateman testified that after he was transferred to another hospital, he contacted Brasseaux's doctor concerning his initial follow-up subsequent to the carpal tunnel release. At that time, Brasseaux reported no improvement of his left sided weakness. Dr. Bateman testified that he did not expect the carpal tunnel release to improve Brasseaux's condition, because he felt these problems resulted from his disc.
If Brasseaux's condition was still the same, Dr. Bateman testified that he would still perform an anterior cervical fusion at the C5-6 disc level. He stated that the recovery time for this procedure would be three to seven days in the hospital, followed by up to two months in a hard collar, and a gradual increase of Brasseaux's activities. He stated that Brasseaux would have an impairment rating as a result of this surgery, because of the fusion. He further testified that the surgery would have a sixty to seventy percent success rate, due to the degenerative changes located at other levels in Brasseaux's cervical spine. Because of the increased stress at C5-6, the fusion would run the risk of creating problems at the adjoining levels. He also stated that there might be the need of further surgery if the fusion was unsuccessful. With regard to video surveillance showing Brasseaux picking up cans, using a Jagger pump, and a swing blade, Dr. Bateman testified that it did not reveal anything about Brasseaux's need for cervical surgery because that need was based more on complaints of pain and discomfort than on function.
Dr. Bateman testified that eighty to ninety percent of cervical discs do not need surgery, and that neurological symptoms can come and go, or go away. He further stated that it is the onset and duration of symptoms which makes Brasseaux a candidate for surgery. Dr. Bateman agreed that any type of trauma to the head or neck could aggravate degeneration already present in a person's *757 neck. Although he did not know about Brasseaux's prior neck and carpal tunnel problems, Dr. Bateman stated that if Brasseaux had not experienced any problems in the years prior to March 5, 1995, then he would attribute his present problems to the incident at issue.
Dr. Jack Hurst, a neurosurgeon, evaluated Brasseaux on November 6, 1996, at the request of Mamou. In a report based on his examination, Dr. Hurst agreed with the interpretation of the MRI which revealed herniation of the C5-6 disc with anterior impingement upon the spinal cord at that level. At the evaluation, Dr. Hurst stressed to Brasseaux the importance of having cervical spine surgery performed at Charity Hospital. Prior to giving his deposition, Dr. Hurst reviewed the surveillance videos. After viewing this footage, he was still of the opinion that Brasseaux had an authentic disc herniation. However, he did not feel that the herniation was causing significant nerve root impingement or that Brasseaux required surgery.
The trial court found that Brasseaux suffered from a pre-existing asymptomatic herniated cervical disc which was exacerbated by the blows he received on March 5, 1995. Finding that the disc is now symptomatic and requiring surgery, and that Brasseaux would suffer from "a degree of accompanying disability," the trial court awarded him $125,000.00 in damages. Concerning the video surveillance footage, the trial court stated "[c]onsidering the manner in which they were obtained, the investigator's testimony, the time taken to produce them and their content, said tapes are neither persuasive nor impressive."
Upon reviewing the record, we find that it was reasonable for the trial court to award Brasseaux damages for the aggravation of his pre-existing herniated cervical disc. Brasseaux testified that he did not remember the accident which resulted in the rupture of his cervical disc in 1983. Considering that the trial court was presented with two views of the evidence through the conflicting views of the medical experts who testified via deposition, we cannot say that its choice between the two is manifestly erroneous or clearly wrong. Nor do we find erroneous the trial court's decision not to credit the surveillance footage. This was a credibility determination and, given the trial court's vast discretion in this area, we find no error in that determination. The trial court's award is affirmed.

Assignment of Error Number Eight
In its eighth assignment of error, Mamou claims that the trial court erred in awarding Brasseaux $100,000.00 in damages for loss of earning capacity. Mamou bases its argument on the fact that Glenn Hebert, the Brasseauxs' rehabilitation specialist, determined Brasseaux's loss of future earning capacity ($450.00 to $550.00 per week) without any evidence of his prior actual earnings and based on Dr. Gouvier's findings that Brasseaux suffered cognitive deficits. It further claims that because Dr. Douglas Womack, the Brasseauxs' economist, determined Brasseaux's projected loss of earning capacity based on Hebert's findings, his findings are also faulty and unreliable.
In Batiste v. New Hampshire Ins. Co., 94-1467, pp. 3-4 (La.App. 3 Cir. 5/3/95); 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95); 660 So.2d 472, the court explained:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344 (La.1990).
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages *758 him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. Finnie v. Vallee, 620 So.2d 897 (La.App. 4 Cir.), writ denied, 625 So.2d 1040 (La.1993).
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident. Finnie, 620 So.2d at 901.
A trial court's award for loss of earning capacity is reviewed under the manifest error standard of review. Detraz v. Hartford Accident and Indem. Co., 94-708 (La.App. 3 Cir. 12/7/94); 647 So.2d 576. The issue is not whether a different award may have been more appropriate, but whether the trial court's award is reasonably supported by the record. Id.
Brasseaux testified that he started working when he was six years old, helping his father with farm chores, and continued doing so until he left school in the seventh grade. After that, he stated that he worked on the farm and "went boardroading." Brasseaux's application for social security disability benefits show that he worked as a farmer from 1966 through 1973, and as a pusher in the oil field from 1974 through 1978, earing $4.00 per hour. The records from the Department of Public Safety and Corrections reveal that Brasseaux was employed as a stock patrolman from July 31, 1979 through April 16, 1982. He resigned from this job in lieu of disciplinary action after he was discovered drinking in a bar while driving a state vehicle. His ending salary for that position was $929.00 per month. The social security records reveal that Brasseaux next worked as a herdsman from April 1982 through February 1983, earning $300.00 per week, and then as a floor hand casing pipe in the oil field from April 1983 through July 1983, earning $1,200.00 per month. Brasseaux worked for and then owned a house-moving business for nine years. However, Tri-Parish Bank foreclosed on the mortgage for this business, and a default judgment was taken against Brasseaux on August 22, 1994.
Brasseaux testified that he operated the Four Aces Lounge for approximately four years prior to his injury, earning $1,000.00 per month. He stated that he leased the building that the lounge operated in and, from time to time, employed someone to help him run the business. Brasseaux testified that following his injury, he ran the lounge for a period of time with the help of his wife and friends. He sold the lounge in October 1996 to Sheryl Savoie for $2,000.00. Beyond that, he testified that he has not worked due to his physical condition. Although Brasseaux had suffered previous injuries, those in 1983, two surgeries on his right shoulder, a broken left wrist, and the placement of steel plates in his right arm, he stated that he could not recall being incapacitated from 1990 onwards.
Hebert opined that Brasseaux was temporarily totally disabled from working as a result of his head and neck injuries. However, even with neck surgery, he felt that Brasseaux would be permanently totally disabled if his cognitive deficits did not improve. After reviewing both neuropsychologists' reports, Hebert did not think that Brasseaux would be able to work if he had severe impairments of his memory because he would have difficulty going to work and staying on task. He stated that Brasseaux will have difficulty working to standards that are required of him, and that he would probably stay in trouble with his boss if he does not stay on task or loses concentration or attention. Hebert testified that due to behavioral or emotional problems, Brasseaux will have difficulty getting along with other employees.
Hebert testified that the finding of a seventeen point drop in Brasseaux's performance IQ would have vocational implications because it would affect his ability to work with his hands. Considering Brasseaux's past work history, Hebert opined that he would not be able to perform those types of *759 employment again. Further, it was his understanding that Brasseaux had returned to work full-time after 1985, and that there was no evidence that he had a disability prior to his injury in 1995.
Hebert testified that prior to the injury at issue, Brasseaux was capable of running a lounge such as the Four Aces. He stated that the skills necessary to operate a lounge included ordering supplies, paying for deliveries, adding up cash, making bank deposits, paying employees, opening and closing, dealing with vendors, and setting prices. Hebert stated that an operator needed certain social skills in order to run a lounge. He should be able to get along with people and want to be with people in that type of environment. Although he did not have any evidence of Brasseaux's income or earnings from the Four Aces, Hebert opined that had he brought his skills onto the open market, Brasseaux could have earned approximately $450.00 to $550.00 per week, or $20,000.00 to $24,000.00 per year as the operator of a lounge. Hebert obtained these figures from government statistics determined for Lafayette, which he adjusted for South Louisiana.
Mark Cheairs, Mamou's vocational rehabilitation specialist, testified that he did not see any reason why Brasseaux could not continue running the Four Aces Lounge and earning the same amount of money he had prior to March 5, 1995. He did not feel that Brasseaux had lost any job skills that he had prior to his injury, and stated that he should be able to run the type of nonsophisticated operation that he ran at the Four Aces. If Brasseaux suffers from severe short term memory problems, Cheairs felt that he might need to make accommodations in order to run the lounge such as having his staff help him remember things. He felt that Brasseaux could run a lounge with the same amount of staff he hired prior to his injury. He did not feel that a personality change or problems with complex reasoning would affect Brasseaux's ability to earn money or run the lounge. With regard to the effect depression would have on Brasseaux's ability to operate the Four Aces, Cheairs testified that it depended on how well it could be maintained pharmacologically.
Cheairs disagreed with Hebert's ability to establish a wage earning capacity when there was no evidence of his past wage earning capacity. He felt that Brasseaux lacked the skills necessary to perform a job post-injury earning $450.00 to $550.00 per week. Cheairs stated that as a result of his neck injury and his cognitive deficits, Brasseaux did suffer some form of diminished earning capacity, however, he still felt that Brasseaux had some transferable memory and cognitive ability from his life and work experience. He opined that Brasseaux had not suffered a permanent and total wage loss as a result of his injuries.
Dr. Womack determined, based on Hebert's calculation of Brasseaux's wage earning capacity, an assessment of economic loss for Brasseaux, both past and future. First he determined an annual value for lost household services of $1,820.00 per year. Based on a work life expectancy of 12.3 years, a growth rate of 4½%, and a discount rate of 6.35%, Dr. Womack determined that if Brasseaux earned $450.00 per week, he had suffered a pre-trial loss of earnings of $49,936.00, including $3,604.00 for 1.98 years of loss household services. If Brasseaux worked until the end of his work life expectancy, then his total loss of earnings would be $246,334.00, including $27,383.00 in loss household services. Brasseaux's total economic loss, pre- and post-trial, would be $296,270.00. Dr. Womack testified that if Brasseaux earned $550.00 per week, his past economic loss would be $56,628.00 and his future economic loss would be $267,607.00, for a total economic loss of $355,222.00.
The trial court awarded Brasseaux $100,000.00 for his loss of earning capacity due to a permanent-partial earning impairment. Although the trial court did not give any reasons for this award, we find that the amount awarded is reasonable. Dr. Womack testified that if the trial court found that Brasseaux would only have earned one-half of $450.00 per week, that it should reduce the amount he determined for loss earning capacity by one-half. The trial court reduced that amount by more than one-half, since one-half of $246,334.00 is $123,167.00. The trial court obviously believed that had Brasseaux *760 not been injured, he would have earned less than $225.00 per week. Brasseaux testified that he earned approximately $1,000.00 per month from the lounge prior to his injury, which is $250.00 per week. Considering the lack of hard evidence as to Brasseaux's past earnings history, other than $929.00 per month in 1979 through 1983, we cannot say that a finding of approximately $170.00 per week or $680.00 per month for the remainder of his 12.3 years of work life expectancy is manifestly erroneous. The judgment of the trial court is affirmed.

Assignment of Error Number Nine
In its final assignment of error, Mamou argues that the trial court erred by awarding Cheryl $25,000.00 for her loss of consortium. Mamou points out that Cheryl left Brasseaux twenty-two months after his injury, two months before trial, and that she still returns to their trailer to perform services for him, such as cleaning, washing laundry, and buying groceries, things she admitted doing prior to March 5, 1995. It states that she left Brasseaux because she said that she needed her space, and that sex did not enter into her reason for leaving.
In order to prove a claim for loss of consortium, a plaintiff must prove three things: (1) the liability of the defendant, (2) his or her spouse's damages, and (3) his or her consequent loss of consortium damages. Peck v. Wal-Mart Stores, Inc., 96-645 (La. App. 3 Cir. 11/6/96); 682 So.2d 974. Loss of consortium is more than just a loss of general overall happiness, it also includes love and affection, society and companionship, sexual relations, the right of performance of material services, and felicity. Detraz, 647 So.2d 576. The trier of fact is given much discretion in awards for loss of consortium and will not be overturned on appeal in the absence of manifest error. Doucet v. Doug Ashy Bldg. Materials, Inc., 95-1159 (La.App. 3 Cir. 4/3/96); 671 So.2d 1148; Lonthier v. Northwest Ins. Co., 497 So.2d 774 (La.App. 3 Cir.1986).
The trial court awarded damages to Cheryl for the loss of consortium she suffered as a result of Brasseaux's injuries. Considering our findings above, the first two elements for finding such a loss have been found. The trial court found, and Mamou does not dispute, that she did suffer this loss. Thus, the only issue remaining is whether the amount awarded was an abuse of discretion. After reviewing the record, we find, that although the amount awarded may be on the high end, we cannot say that the trial court abused its much discretion in awarding Cheryl $25,000.00 for her loss of consortium.
Cheryl testified that she separated from Brasseaux two months prior to the trial due to the stress of having to care for him. She stated that Brasseaux had become very demanding, and required a lot of attention as a result of his physical and mental conditions. Following the incident, Cheryl testified that their sexual relations had decreased as much as fifty percent, and she blamed it on stress and Brasseaux's performance. She stated that they had not had sexual relations since a month prior to her leaving. Although they had not filed for divorce, Cheryl was unsure if she would return to Brasseaux, however, both admitted that they still loved each other.
Cheryl testified that prior to March 5, 1995, she maintained the trailer she and Brasseaux lived in and washed their laundry. She stated that Brasseaux would accompany her to the grocery store, pick up inside the trailer, mow the grass, pick up trash outside, and help her maintain the yard and flower beds. After his injury, Cheryl stated that she continued doing the same things and even after she moved out, she continues maintaining the trailer, washing clothes, and buying groceries. She testified that she drives Brasseaux to his doctors' appointments, assists him financially by paying the utility and phone bills, and by giving him money whenever possible.
Brasseaux testified that before March 5, 1995, he and Cheryl would go out dancing, go to suppers, visit family and friends, go to the racetrack, cock fights, and on trail rides. After his injury, he stated that they were unable to do any of those things except get together with a few friends, or slow dance at the Four Aces.
Finding no error in the trial court's award, we affirm that portion of its judgment. *761 Mamou's final assignment of error is dismissed.

THE BRASSEAUXS

Assignment of Error Number One
In their first assignment of error, the Brasseauxs argue that the trial court erred by not finding Mamou and Lavergne solidarily liable with Bordelon. The trial court assessed fifty percent of the fault to Mamou and Lavergne and the remaining fifty percent to Bordelon. The Brasseauxs argue the trial court should have allocated the fault of Lavergne and Bordelon pursuant to La.Civ.Code. art. 2324(A), instead of Article 2324(B), since they both participated in the assault on Brasseaux.
Even though the trial court did not expand on its allocation of fault, we find no error in its allocation. We agree with the trial court that the 1996 amendment to La. Civ.Code art. 2324 was a substantive change in the law, thus, it does not apply retroactively. However, the Brasseauxs argue that the trial court should have allocated fault pursuant to Article 2324(A) which provides, "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."
Pursuant to Mamou's third assignment of error, we have already held that the trial court did not err in assigning fifty percent of the fault to Lavergne and Mamou. That finding necessarily required us to review the trial court's determination that Lavergne was negligent. Since Article 2324(A) pertains only to intentional acts, and we found no error in the trial court's finding of negligence, we need not revisit the issue of Lavergne's culpability. This assignment of error is dismissed for lack of merit.

Assignment or Error Number Two
In their second assignment of error, the Brasseauxs allege that the trial court erred in awarding only $250,000.00 in damages to Brasseaux for his head injury. Again, since we have already held that the trial court's award as to this item of damage was reasonable, we need not revisit this issue.

Assignment of Error Number Three
Finally, the Brasseauxs argue that the trial court erred in finding that they failed to prove that Brasseaux's diabetes and carpal tunnel syndrome was caused or related to his injury of March 5, 1995. After examining the record, we cannot say that these findings are manifestly erroneous or clearly wrong.
Dr. Luke Bordelon's records reveal that Brasseaux was having trouble with carpal tunnel difficulties in July 1984. Dr. Reiss Plauche, a resident in orthopedic medicine at University Medical Center, treated Brasseaux for his neck and carpal tunnel difficulties in the Charity Hospital System following his injury. He stated that the nerve entrapment in Brasseaux's left arm was not caused by his March 5, 1995 injury. Dr. Bateman also testified that if Brasseaux had a prior history of carpal tunnel syndrome, then he could not relate it to his injury. He did admit that Brasseaux's fall to the ground could have caused this problem.
Dr. St. Cyr testified that he saw Brasseaux on March 6, 1995, because of his elevated glucose level. Brasseaux's head injury was treated with steroids by Dr. Juneau, and Dr. St. Cyr testified that steroids are known to increase the glucose level in patients who either have or are borderline diabetics. He further stated that trauma, in addition to steroids, may raise a person's glucose level. Dr. St. Cyr testified that there was nothing in Brasseaux's history which indicated that his glucose level was elevated prior to March 5, 1995.
On December 5, 1983, a laboratory report from Doctors' Hospital shows that Brasseaux's glucose level was 126. A notation written below this states that this level is high. A portion of Gerald Miller's deposition was also introduced into evidence. Although Miller testified at the trial that Brasseaux never told him he had diabetes, when questioned in his deposition, Miller stated that Brasseaux's diabetes was not bad prior to March 5, 1995. He testified that Brasseaux told him that he was "a little bit diabetic" and that he was not supposed to drink beer as a result of this condition. Brasseaux *762 reported to Miller that he would get a headache when his diabetes bothered him.
Considering the evidence, we cannot say that the trial court erred in finding that the Brasseauxs failed to prove by a preponderance of the evidence that these two conditions were caused by or related to the March 5, 1995 incident. This assignment of error is dismissed, and the trial court's judgment is affirmed.

LAVERGNE

Absence of Liability
In his only assignments of error, Lavergne adopts Mamou's assignments of error numbers four, six, seven, eight, and nine, and assignment of error number three to the extent that it argues Bordelon should be held one hundred percent at fault. Since we have affirmed the trial court's findings and have dismissed Mamou's assignments as being without merit, these assignments are rendered moot.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this matter are assessed seventy-five percent to the defendants-appellants/appellees, The Town of Mamou and Keith Lavergne, and twenty-five percent to the plaintiffs-appellees/appellants, Richard and Cheryl Brasseaux.
AFFIRMED.
NOTES
[1] This intervention was later dismissed upon motion of both the Brasseauxs and Tri-Parish.
[2] The records from the Acadia-St. Landry Hospital show that Brasseaux was admitted to the emergency room on October 5, 1976 as a result of overdosing on drugs and alcohol.
[3] Brasseaux had been prescribed Xanax by Dr. Mark St. Cyr, who was treating him for diabetes.