719 So.2d 627 (1998)
Edith K. (Darby) HANSON
v.
David M. BENELLI, et al.
No. 97-CA-1467.
Court of Appeal of Louisiana, Fourth Circuit.
September 30, 1998.
*630 Kendra LaNata Macquet, New Orleans, for Plaintiff/Appellee Edith K. Hanson.
Christopher E. Lawler, Donovan & Lawler, Metairie, for Defendant/Appellee Allstate Insurance Company.
Frank G. DeSalvo, Frank G. DeSalvo P.L.C., New Orleans, for Defendant/Appellant David Benelli.
Salvatore Panzeca, John Ulz, Panzeca & D'Angelo, Metairie, for Defendant/Appellant City of New Orleans.
Before SCHOTT, C.J., and LOBRANO, PLOTKIN, LANDRIEU and MURRAY, JJ.
MURRAY, Judge.
In this personal injury suit, Edith K. Hanson[1] seeks compensatory damages as well as a punitive award under Civil Code article 2315.4 for injuries resulting from an automobile accident. The defendants are David M. Benelli, the off-duty New Orleans Police Lieutenant who rear-ended her; the City of New Orleans, as Lt. Benelli's employer and owner of the car he was driving; and Allstate Insurance Company, Lt. Benelli's liability insurer.[2]
The accident occurred in eastern New Orleans shortly after 2:00 a.m. on Friday, December 21, 1990. Two eyewitnesses, Curtis and Jeronda Bordenave,[3] testified that they were in a car heading eastbound in the middle lane of Chef Menteur Highway when they were passed on the right by a speeding white car. Both believed it was an unmarked police car because of the make, color and model, even before they saw the public license plate or the uniform hanging in the backseat. As this car sped past them at seventy miles-per-hour or better, they noted that the headlights were not on and that it was swerving and weaving, narrowly missing a pole near the intersection of Downman Road. The couple commented that the driver must be drunk and that they had better watch the car closely because an accident could present a sudden hazard to them.
The Bordenaves' attention was thus focused on the speeding vehicle as it approached Chantilly Street, about two blocks ahead of them. Several cars were stopped in all three lanes of Chef Highway, waiting at a red traffic signal. Neither witness saw any brake lights go on or any indication that the driver of the white car attempted to slow down or stop. Instead, "it looked like he tried to go between two vehicles" in the middle and right lanes, ramming into Ms. Hanson's car in the middle lane and leaving all of the vehicles scattered about the intersection. The white car spun around onto the front lawn of a nursing home on the corner, stopped briefly, then took off at a high rate of speed, now heading west on Chef Menteur. At about the same time, the Bordenaves arrived at the intersection and someone exited one of the cars, yelling "Go after him!" Because it looked like Ms. Hanson, who was still in her vehicle, would be taken care of by the others at the scene, the Bordenaves pursued the white car down Chef Highway and onto eastbound I-10. The Bordenaves estimated that they exceeded eighty miles an hour on the interstate and then onto Read Road, past Methodist Hospital, trying to get close enough to read the license plate. By the time they reached the police station on Read Road, Ms. Bordenave had written down the vehicle's license number. As they pulled into the police station to report the accident, they watched the white car speed out of sight without turning. The police quickly confirmed that the license number was that of an unmarked police vehicle.
At 4:20 that morning, Lt. Benelli reported to his command desk that he had been in an accident and was at Methodist Hospital's emergency room. He explained that he did not see what happened because he was bent down trying to get his emergency light from beneath the pedals where it had rolled. After the impact, in which he hit his head, he *631 thought he had just hit a pole and so decided to go to Methodist Hospital. However, he changed his mind on the way to the hospital and instead returned to the accident scene, which he believed was at Wilson Street and Chef Highway. In a daze, he "eventually made it back to the hospital." Lt. Benelli denied that he had been speeding prior to the accident, but also testified that he had no clear memory of many details of that night.
Blood drawn from Lt. Benelli at 6:15 a.m. revealed an alcohol content of 0.15%. Subsequent state charges for driving while intoxicated and hit-and-run driving were dismissed, and a plea of nolo contendre was accepted on a municipal charge for the latter offense. The police department suspended Lt. Benelli for sixty days for these violations as well as for his failure to adhere to NOPD rules and regulations. These infractions included "neglect of duty," because he failed to stop at the accident scene and failed to immediately report the accident. He was also required to pay for the damage to the City's car.
After trial, the district court found Lt. Benelli was solely at fault in causing the collision, but that the plaintiff had failed to prove that his intoxication was a cause-in-fact of her injuries. Because the court held that the officer was in the course and scope of his employment at the time of the accident, the City was found to be vicariously liable for his conduct. It was further determined that coverage did not exist under Allstate's policy because the city-owned vehicle Lt. Benelli was driving was furnished for his regular use, and was thus expressly excluded under the contract of insurance. Judgment was rendered against Lt. Benelli and the City, awarding Ms. Hanson $125,000.00 for general damages, $2,174.28 for past medical expenses, and $15,000.00 for future medical expenses. Her claim for exemplary damages was denied.
The City appeals, asserting error in the determination that Lt. Benelli was in the course and scope of his employment at the time of the accident. In addition, the general damage award is challenged as excessive, and the award for future medical expenses is asserted to be unsubstantiated by the evidence.
Ms. Hanson has answered the appeal, seeking reversal of the trial court's rejection of her claim for punitive damages and asking for an increased award of $7,174.28 for past medical expenses and at least $30,000.00 for future medicals. She also asserts that the City should be held liable for its own negligence in furnishing Lt. Benelli with a vehicle with defective equipment. Finally, Ms. Hanson challenges the trial court's decision that the Allstate policy excluded coverage for this accident.
Lt. Benelli has also appealed, joining the City's claim that the damages awarded are excessive and must be reduced.

LIABILITY OF THE CITY OF NEW ORLEANS
Although this opinion will address each of the errors assigned by the parties herein, it must be acknowledged at the outset that the most difficult aspect of this case involves the question of whether Lt. Benelli was in the course and scope of his employment with the New Orleans Police Department when he rammed into and injured Mrs. Hanson.
In most cases, an innocent victim who is injured as a result of the negligence of an employee driving his employer's car can be compensated through the employer's liability insurance, regardless of whether the employee acted within the course and scope of his employment. This is so because the Louisiana Motor Vehicle Safety Responsibility Law (LMVSRL) La. R.S. § 32:851-1043 requires that vehicle owners maintain vehicle liability insurance. "At the heart of this statutory scheme is the decision to attach the financial protection to the vehicle rather than to the operator." Hearty v. Harris, 574 So.2d 1234, 1237 (La.1991). The requirement to provide insurance generally includes the mandate that vehicle owners insure permissive use of their vehicles by providing omnibus coverage, which is "intended to extend liability beyond the law of principal and agent." Id. at 1238.
However, a political subdivision, such as the City of New Orleans, is exempt from the *632 requirements of the LMVSRL. La. R.S. § 32:1041. Because the City is not required to maintain vehicle liability insurance, it has no legal obligation to furnish omnibus insurance coverage for its vehicles. Consequently, assuming it has no independent liability, the City has no responsibility for the injuries to Ms. Hanson unless Lt. Benelli was in the course and scope of his employment with NOPD. Neither the LMVSRL nor any City regulation required that Lt. Benelli insure the automobile for his personal use, despite the forseeable risk of harm arising from that use. Lt. Benelli had a personal automobile liability policy, but this policy excluded his use of the City-owned car he was driving at the time of this accident, as is discussed infra. As a result, there is no insurance available to compensate Ms. Hanson for the injuries she sustained in this accident if Lt. Benelli was not in the course and scope of his employment.
Absent a legislative requirement that government vehicles be insured for any permissive use, the City, therefore, may allow unlimited personal use of its vehicles with impunity. This leaves members of the general public, as well as the employee-drivers, unprotected for much of the time these vehicles are being used. Given this State's strong public policy that only insured automobiles be allowed on its roads, the Legislature should consider if this is the result it intended.

VICARIOUS LIABILITY:
The trial court found the City liable for Lt. Benelli's conduct pursuant to Civil Code article 2320, which provides that "employers are answerable for the damage occasioned by their servants ... in the exercise of the functions in which they are employed." In order to establish vicarious liability for an employee's negligence under this Article, it must be shown that the employee's general activities at the time of the tort were within the course and scope of his employment. Ermert v. Hartford Insurance Co., 559 So.2d 467, 478 (La.1990). At the time of this accident, Lt. Benelli, a twenty-three year veteran of the New Orleans Police Department, was a Fifth District platoon commander assigned to the evening shift, 3:00 to 11:00 p.m.. An unmarked, city-owned white 1983 Ford Crown Victoria with public license plates was furnished for his exclusive use, and he regularly drove it on patrol as well as on business and personal errands. The only restriction on his use of this car was that he needed permission to take it out of the three parishes comprising metropolitan New Orleans. Although this car had no built-in siren, police radio or fixed emergency lights, Lt. Benelli was provided with a portable two-way radio and a movable "teardrop" blue flashing light that could be placed on the dashboard when necessary.
Lt. Benelli testified that he was scheduled off on Thursday, December 20, 1990, and had not worked at all that day.[4] That evening, he dressed in civilian clothes, then drove the unmarked police car to the Police Association of New Orleans (PANO) headquarters. He parked his car in the PANO lot and, sometime before 6:00 p.m., joined other officers to attend several holiday parties. None of the parties he attended that night were NOPD-sanctioned, but all were hosted and attended by other police or those affiliated with the police.[5] Lt. Benelli testified that during the next six hours he had nothing to eat, and he estimated that he drank about six alcoholic beverages while attending various parties. Another police officer drove Lt. Benelli back to PANO headquarters sometime after 1:00 a.m. on Friday, December 21st. He was on his way home when this accident occurred.
Lt. Benelli testified as follows with regard to his responsibilities as a police officer, and his use of the City-owned vehicle:
Q. Back on December 21, 1990, Lieutenant, were you on call twenty-four hours a day?
A. As a Platoon Commander, yes.

*633 Q. Isn't it true that you consider yourself always on duty?
A. Yes.
Q. Did you always carry a beeper?
A. Yes.
Q. Did you not also have a portable radio in your car?
A. Yes.
Q. Did you not have unrestricted permission to use this police issued vehicle?
A. Yes.
* * * *
Q. Isn't it also true that you carried your police credentials at all times?
A. Mandated, yes.
Q. You are required to?
A. Yes.
Q. Isn't it true that one of the reasons you were on duty twenty-four hours a day is that you are required to be accessible to NOPD at all times?
A. Yes.
Q. Isn't it also true, at all times using a police vehicle you are required to respond to a crime that you see?
A. Yes.
Q. Isn't it also true that you are encouraged to use the police vehicle when off duty as much as possible, so as to constitute a deterrent to crime?
A. As far as using the vehicle for deterrent factors, yes.
Q. Isn't it also true, Lieutenant, that while using the police vehicle off duty and [sic] observed a crime and do not respond, you would be subject to discipline?
A. Yes, I would.
* * *
Q. It is also correct that Department Policy when you were issued this car, that you were also to use it for personal errands, is that not correct?
A. As far as Departmental policies?
Q. As a deterrent.
A. That's one of the reasons why they gave take-home cars out, to saturate the city with units as a deterrent, right.
Q. In fact, you did comply with that attempt to saturate the city with patrol cars by using yours for personal errands, such as the night of this incident, correct?
A. Correct.
At the time of this accident, Lt. Benelli's police radio was locked in the trunk of his police car, where it had been since 6:00 the previous evening. Although the car was an unmarked unit, it was his opinion that "every kid older than four knew that I was in a police car" because of the color, model and public plates.[6]
The trial court noted that Lt. Benelli, although not scheduled to work on the day of the accident, had left a holiday party at the 6th District Police Station driving an unmarked police vehicle. Stating in its reasons for judgment that "the factors of Lt. Benelli's job and his activities on the date of the accident were quite similar to the facts of Johnson v. Dufrene," the court concluded that he was in the course and scope of his employment with the NOPD.
Ms. Hanson and Lt. Benelli contend that his uncontradicted testimony regarding NOPD's policy and the requirement that he perform as a police officer whenever the need arises supports this conclusion. They argue that, as in Johnson v. Dufrene, the benefits derived by the City from his 24-hour availability, establish that he was in the course and scope of his employment when this accident occurred. They note that the City has asserted control over Lt. Benelli's off-duty activities by disciplining him for his conduct in connection with this accident, further justifying the trial court's determination that the City is vicariously liable in this case.
The City contends that this determination is clearly wrong because it rests upon the erroneous finding that Lt. Benelli had attended a party at a police station. The City also distinguishes the facts of Johnson v. *634 Dufrene, 433 So.2d 1109 (La.App. 4th Cir.), writ denied, 441 So.2d 765 (La.1983), from those established here, emphasizing the lack of testimony to corroborate Lt. Benelli's claim that he was subject to call at all times. Because he was so clearly pursuing his own personal motives that night, with no connection in time, place or function to his duties as a police officer, the City asserts that there is no basis for the decision that Lt. Benelli was in the course and scope of his employment.
We agree. For us to affirm the finding that Lt. Benelli was in the course and scope of his employment we must hold that a New Orleans police officer is in the course and scope of his employment as a policeman whenever he is involved in an accident driving a car owned by NOPD. Neither the policy behind the doctrine of respondeat superior nor the jurisprudence support this proposition.
In Johnson v. Dufrene, this Court identified the important considerations that bear on the determination of course and scope: "[W]hether the vehicle was being used in such a manner as to benefit the employer; whether the employee was subject to the employer's control at the time of the accident; whether the employee's use of the vehicle was authorized by the employer; and whether the employee's motive arose from personal objectives or, instead, from his employer's concerns." 433 So.2d at 1112 (emphasis in the original; citations omitted). It was further noted that each case involving injury caused by the negligent operation of an employer's vehicle must be decided on its own facts. Id.
The unique facts of Johnson compelled this court to conclude that Sgt. Dufrene, the defendant police officer, was acting within the course and scope of his employment at the time of the auto accident. Sgt. Dufrene possessed unique knowledge and skills that were essential to the NOPD, necessitating his use of a radio-equipped car to ensure 24-hour availability. The evidence established that he was the only NOPD employee trained to correct malfunctions in the Department's specialized filing machines, which had to be operational at all times. He was also the only officer who had after-hours access to a room containing major felony reports. Based on these facts, this Court noted:
It does not stretch the meaning to say that Dufrene conferred a "benefit" to his employer every time he rode in his own police car rather than, for instance, his wife's personal automobile. By virtue of the car's police radio, he was accessible, and his accessibility was deemed vitally necessary to the N.O.P.D. in the performance of its most important functions. Similarly, driving the police car even while on personal missions was itself a part of Dufrene's duty to remain "on call" and subject to his employer's control. Thus, it cannot be said that Sergeant Dufrene's mission was purely personal. Being "on call" at all times, he was therefore duty-bound to use his police car rather than another, and in carrying out that duty, he performed a function of his employment.

Id. at 1113 (emphasis in original).
There is no evidence that Lt. Benelli possessed unique knowledge or skills that required him to be "on call" and subject to his employer's control even while on personal missions. As a police officer, Lt. Benelli is obligated to take appropriate action if an emergency situation presents itself. However, that obligation, in and of itself, does not equate with his being "on duty" twenty-four hours a day.
Ms. Hanson and Lt. Benelli contend that the trial court found that the City's policy was to encourage police officers to use official vehicles for personal use because of the deterrent effect that the visibility of a police presence has on crime. They argue that this Court can reverse that finding only if it is manifestly erroneous.
This argument is not supported by the trial court's written reasons for judgment. The trial court was quite explicit that it predicated its vicarious liability upon the "authority" of Johnson v. Dufrene. As discussed above, Johnson presented a unique situation. It is limited to its facts. Assuming that having off-duty police cars on the street benefits the City by deterring crime, that benefit is virtually non-existent where, *635 as here, the car in question is not identified as a police car, Lt. Benelli's self-serving testimony aside.
Nor does the record establish that Lt. Benelli's attendance at the various holiday parties that night was either mandated by the NOPD or was in the furtherance of his duties as a platoon commander. Contrary to the trial court's statement, none of the parties was shown to have been held at a police station or a site selected by the NOPD, and Lt. Benelli had been off-duty the preceding day as well as on the night in question. These were private celebrations rather than events sponsored by the department. The fact that they were attended by other police officials and those associated with law enforcement merely reflects a natural tendency to socialize with those who share similar backgrounds and interests. Thus, there is no evidence that Lt. Benelli's employer exercised any direct control over his general activities that night, or that his employment as a police officer imposed a duty on him to attend these functions. There was no connection between the time or place of the parties and the NOPD's business. Lt. Benelli parked his police car at PANO Headquarters at 6:00 p.m. on December 20, and rode with someone else to several parties where he consumed a number of alcoholic beverages until approximately 1:00 a.m. on December 21, when he retrieved the police car and attempted to drive himself home. It is ludicrous to suggest that Department policy mandated Lt. Benelli's use of the police car under these circumstances.
Ms. Hanson contends that the disciplinary action taken against Lt. Benelli for his conduct that night is an indirect assertion of employer control, so as to justify the imposition of vicarious liability on the City. However, this court has previously held that the enforcement of an employer's rules and standards of conduct is not, of itself, sufficient to establish that an employee acted within the course and scope of his employment. Kogos v. Payton, 522 So.2d 1198, 1200 (La.App. 4th Cir.1988); Normand v. City of New Orleans, 363 So.2d 1220, 1222 (La.App. 4th Cir.1978).
In summary, we find that the relationship between Lt. Benelli's activities on the night in question and his employment duties was insufficient to establish that this accident occurred while he was in the course and scope of his employment. The record does not establish that Lt. Benelli's activities at the time of the accident were "so closely connected in time, place and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business." Baunieister v. Plunkett, 95-2270, p. 3 (La.5/21/96), 673 So.2d 994, 996 (citation omitted). Even though Lt. Benelli was driving a police vehicle at the time of the accident, the evidence establishes that his conduct was motivated by purely personal considerations, unrelated to his duties as a police officer. The City, therefore, cannot be held vicariously liable for his negligence.
Were it not for the consequences of the failure to find the City vicariously liable in this case, we would have no difficulty in determining that Lt. Benelli, an off-duty police officer who had been party-hopping for several hours, and who was driving home in an unmarked police unit with his police radio locked in the trunk of his car, was not functioning as a police officer at the time of this accident. Despite our concern for Ms. Hanson, an innocent victim, we must resist the temptation to make bad law in order to provide a solvent defendant. To find vicarious liability based on these facts would have serious ramifications for the doctrine of respondeat superior, far beyond the context of this case.

PRIMARY LIABILITY
As an alternative to the vicarious liability discussed above, Ms. Hanson contends that the City is independently liable for defective equipment in its vehicle.
Under Civil Code article 2317, a person is responsible for damages caused by a thing in his custody if it is shown that a defective condition of the object posed an unreasonable risk of harm. Boyle v. Bd. of Supervisors, LSU, 96-1158, p. 3 (La.1/14/97), 685 So.2d 1080, 1082. A public entity, however, may not be found liable under Article 2317 unless it is also shown that the entity had actual or constructive notice of the defect yet failed to correct it within a reasonable *636 period. La. R.S. § 9:2800 B; Fortune v. City of New Orleans, 623 So.2d 701, 703 (La.App. 4th Cir.), writ denied, 629 So.2d 1126 (La. 1993). Actual notice is provided by reporting the defect to a governmental employee who has a duty "either to keep the property involved in good repair or to report dangerous conditions to the proper authorities." Fortune at 704, citing Fragala v. City of Rayville, 557 So.2d 1118 (La.App. 2d Cir.), writ denied, 561 So.2d 103 (La.1990).
Determination of whether an unreasonable danger has been proven requires the weighing of "factors such as gravity and risk of harm, individual and societal rights and obligations, and the social utility involved." Boyle, 96-1158 at 5, 685 So.2d at 1083. Economic factors, including the cost to repair or correct a defective condition, are proper considerations in determining social utility. Id. at 6, 685 So.2d at 1083. It is the plaintiff's burden to demonstrate that the gravity and risk of harm outweighs the social utility of the property involved. Id.
Lt. Benelli testified that the "teardrop" light, although not permanently affixed to the dashboard of his car, was meant to sit on the dash when needed to respond to an emergency call. However, because of the light's size and shape as well as the design of the 1983 Ford Crown Victoria, he had problems with it sliding off the dash and around the floor of his vehicle, usually on the passenger side. Until the night of this accident, the light had never rolled under the brake pedal, which he believes is what happened because the light later had a dent in it.
Because of his problems with the "teardrop" light, Lt. Benelli had asked for a flatter, "pancake-type" emergency light that he believed would not move as easily, but he was told none was available. He did not explain why he needed a different emergency flasher, nor did he ask that the light be permanently fastened onto the dashboard. Lt. Benelli testified that in 1990, "the vehicle situation was quite bad.... [W]e just had to deal with what we had."
Ms. Hanson asserts that this evidence establishes the City's liability for providing Lt. Benelli with defective equipment. She argues that because the officer testified, without contradiction, that he was unable to prevent his "teardrop" emergency light from sliding on the floor when not in use, and that this accident occurred because the light slid under his feet, the elements of this claim are established. The City contends that the trial court properly rejected this argument because the officer had not reported that the light caused a problem, as required under La. R.S. § 9:2800, and because there was no evidence that the light itself was defective.
Despite the City's claim that it had no notice of any defect, Lt. Benelli's knowledge of the problems with the "teardrop" light would arguably meet the statutory requirements; it is difficult to imagine that a police lieutenant serving as platoon commander does not have a duty to report dangerous conditions to those responsible for correcting them. However, even assuming that his knowledge constitutes actual notice under the statute, we find that Lt. Benelli's testimony is insufficient to establish that this "improper equipment" represented a defective condition posing an unreasonable risk of harm.
Although the extent of Ms. Hanson's injuries, discussed below, demonstrates the potential gravity of harm that might result from the "teardrop" light falling onto the floor, there was no evidence suggesting a significant likelihood of this occurrence. Instead, Lt. Benelli testified that he was generally able to position the light so that it fell onto the passenger's side rather than the driver's side, and, in fact, that it had never before interfered with his driving by rolling underneath the pedals. Furthermore, the plaintiff failed to produce any evidence to establish whether the cost to replace the "teardrop" lights with another type would outweigh the functional benefits these emergency flashers provided, or even that the "pancake-type" light Lt. Benelli requested would otherwise function as well as those in use.
We thus conclude that Ms. Hanson failed to prove that the City is liable for her injuries, either as Lt. Benelli's employer or as the custodian of equipment that presented an unreasonable risk of harm. The judgment *637 against the City of New Orleans must be reversed, and all claims against it dismissed with prejudice.

LIABILITY OF ALLSTATE INSURANCE COMPANY
In its written reasons for judgment, the trial court found that Lt. Benelli's personal automobile liability policy expressly excluded coverage of the City-owned vehicle he was driving that night. The judgment rendered in the case, however, neither dismisses Ms. Hanson's claim against Allstate nor holds it liable for any part of her damages.
Allstate's policy provides that it "protects an insured person from claims for accidents arising out of the ownership, maintenance or use ... of an insured auto." While it is undisputed that Lt. Benelli is an "insured person," the only definition of an insured auto that might apply to the unmarked police car specifies that coverage is provided for:
A non-owned auto used by you or a resident relative with the owner's permission. This auto must not be available or furnished for the regular use of an insured person. [Emphasis in original.]
Ms. Hanson contends that this provision is ambiguous because "regular use" is not defined. She claims that if this court finds that Lt. Benelli was not in the course and scope of his employment at the time of this accident, then it follows that the police car was furnished only for official business, not "regular use." Otherwise, Ms. Hanson argues, the result will be that both the vehicle and Lt. Benelli were uninsured at the time of this accident, contrary to the public policy of this state.
Allstate maintains that the provision at issue is clear and unambiguous, as was Lt. Benelli's testimony regarding his "regular use" of the unmarked police vehicle. It argues that in Peyton v. Bseis, 96-0309 (La. App. 4th Cir.8/21/96), 680 So.2d 81, similar policy language was interpreted to exclude coverage when a police officer regularly used any of a number of cars in the motor pool, rather than one particular vehicle assigned to him, as is the case here. Because the evidence clearly establishes that this car was owned by the City, rather than its insured, and that it was furnished for Lt. Benelli's regular use, Allstate asserts that it bears no liability for Ms. Hanson's damages.
We find no ambiguity in either the policy language or in its application under the facts established here. Contrary to Ms. Hanson's argument, it is not necessary that all terms used in a contract be defined; unless the words have acquired a technical meaning, contractual language must be given its "general, ordinary, plain and popular meaning." Ledbetter v. Concord General Corp., 95-0809, pp. 3-4 (La.1/6/96), 665 So.2d 1166, 1169. Lt. Benelli's uncontroverted testimony establishes that the unmarked car was assigned to him for use on a 24-hour basis, whether for official business or for personal errands. Because this constitutes "regular use" within the common, ordinary meaning of those words, the policy cannot be interpreted to cover this accident. See Peyton v. Bseis, supra, and cases cited therein.
Furthermore, we cannot accept Ms. Hanson's attempt to link the interpretation of this policy provision with whether or not Lt. Benelli was in the course and scope of his employment. The plain meaning of the policy language excludes coverage of all non-owned vehicles available for any "regular use," not just those furnished for Lt. Benelli's "regular business use." Thus, the determination that the City is not liable for its employee's off-duty conduct has no bearing, legally or logically, on the interpretation of the policy language.
Nor do we find Ms. Hanson's public policy argument persuasive. Were we to interpret this policy to provide coverage, Allstate would bear the burden of the Legislature's exemption of the City of New Orleans from the obligation to provide pliability insurance for its vehicles.
For these reasons, Allstate cannot be held liable under Lt. Benelli's policy. The evidence clearly demonstrates that this accident arose from his use of a non-owned vehicle "available or furnished for [his] regular use," as those words are commonly defined. Therefore, the judgment must be amended to *638 dismiss Ms. Hanson's claim against Allstate Insurance Company.

EXEMPLARY DAMAGES
The trial court rejected Ms. Hanson's claim for damages under Civil Code article 2315.4, which states:
In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries.
Recovery under this statute requires proof that: (1) the defendant was intoxicated; (2) the intoxication was a cause-in-fact of the accident; and (3) that the defendant acted with a conscious indifference to the safety of others. Bourgeois v. State Farm Mutual Automobile Ins. Co., 562 So.2d 1177, 1180 (La.App. 4th Cir.), writ denied, 567 So.2d 611 (La.1990). This determination rests upon the factual findings of the district court and is reviewed under the manifest error standard. Id.
At trial, both Curtis and Jeronda Bordenave testified that Lt. Benelli's car passed them at a high rate of speed and was swerving and weaving. They saw no headlights on it, and it did not appear that any attempt was made to stop prior to the accident. Neither of them saw the driver duck down as if attempting to reach something on the floor, either when he passed them or as he approached the intersection ahead. Based upon the speed and erratic course of the vehicle, both believed the driver was drunk. Furthermore, after ramming into two or more vehicles stopped at a visibly red traffic signal, the driver spun out of control, then took off at a high rate of speed.
Ms. Hanson testified that while stopped at the red light, she "saw a car [in the rearview mirror] coming awfully fast, but he was quite a ways back, and I just assumed he was going to stop." She lit a cigarette, then was hit from behind. She was not asked whether she saw headlights on the car.
It was established at trial that Lt. Benelli's blood alcohol content approximately four hours after this accident was 0.15%, and he admitted having six drinks, but no food, between 6:00 p.m. and about 1:00 a.m.. Lt. Benelli testified that as he approached the traffic signal he was travelling at the same approximate speed, forty to forty-five miles per hour, as others on Chef Highway. He denied being intoxicated, and pointed out that no field sobriety test was given when the blood was drawn. Although he was charged with driving while intoxicated, that charge was later dismissed. As previously recounted, he attributed the accident to his attempts to retrieve his emergency light from the floor under his feet. Lt. Benelli admitted he left the accident scene, but explained that he was dazed and thought he had only hit a pole.
The trial court found this evidence insufficient to prove that Ms. Hanson was entitled to exemplary damages, explaining as follows:
Lt. Benelli testified that he was attempting to pick up his "pancake" (blue) light from the floor of his vehicle when the accident occurred. No other testimony was elicited as to the cause in fact of the collision and the plaintiff's injury. For that reason the Court finds plaintiff failed to prove that Lt. Benelli's intoxication (admitted by the City of New Orleans and confirmed by the blood alcohol reading of.15 percent) was a cause in fact of the plaintiff's injuries.
Ms. Hanson asserts that the district court erred in rejecting her claim because she did not have to prove that intoxication was the sole cause of the accident, but only a cause-in-fact. She argues that since Lt. Benelli was found to have been intoxicated, it is reasonable to conclude that his intoxication contributed to his inability to retrieve his emergency light as well as his inability to stop before the collision. Ms. Hanson maintains that as a police officer, the defendant's conduct was especially egregious, demonstrating his conscious disregard for the likely consequences of driving after a night of party-hopping. Therefore, she asks that this court award an appropriate amount in exemplary damages.
*639 Adopting the City's opposition to the plaintiff's claim, Lt. Benelli argues that the evidence presented is insufficient to prove the requisite elements for recovery under Article 2315.4. He emphasizes the lack of expert testimony concerning the effects of alcohol consumption on someone of his build or of the level of impairment demonstrated by a 0.15% blood level. Lt. Benelli maintains that without an expert opinion as to his intoxication, the judge was faced with a mere credibility determination between his own explanation as to the cause of the accident and the Bordenaves' unfounded assumption that he was driving drunk. He contends that the trial court's decision to credit his testimony over that of the two witnesses is not clearly wrong and thus may not be reversed.
Despite the lack of expert testimony, we find the district court's determination that Lt. Benelli was intoxicated is fully supported by the record. Although the statutory presumption of intoxication for blood alcohol levels of 0.10% or greater does not apply in civil cases, that is not the only means of proving sufficient impairment under Article 2315.4. Owens v. Anderson, 93-1566, p. 6 (La.App. 4th Cir.1/27/94), 631 So.2d 1313, 1317, writs denied, 94-0462, 94-0494 (La.4/7/94), 635 So.2d 1135. As in Owens and the cases cited therein, the eyewitnesses' descriptions of Lt. Benelli's erratic driving, the circumstances of the actual collision, and the chase that followed all suggest loss of normal mental and physical faculties. This impression is only reinforced by Lt. Benelli's explanation that while driving at least forty miles per hour on a major urban roadway occupied by several other vehicles, his emergency light somehow got wedged beneath his brake pedal and he decided that his only option was to duck down under the dash to retrieve it. Thus, the trial court did not err in finding Ms. Hanson carried her burden of proof as to the defendant's intoxication.
In view of this same evidence, however, we find clear and manifest error in the determination below concerning the lack of testimony on the issue of causation. Rather than indicating that the trier of fact rejected the Bordenaves' description of events, as the defendant suggests, it appears instead that the court believed this lay testimony was insufficient under the law. As explained above, however, scientific evidence or expert opinion is not essential to a finding of intoxication. Furthermore, as noted in Bourgeois, supra, "it is common knowledge that even a minimal amount of alcohol may cause a functional impairment." Considering that Lt. Benelli's blood alcohol level was 0.15% four hours after the accident, we find the record evidence compels the conclusion that his intoxication contributed to his inability to retrieve the emergency light more quickly or to respond more appropriately to the situation. It was thus established that, as required under Article 2315.4, Lt. Benelli's intoxication was a cause-in-fact of the accident and Ms. Hanson's injuries.
Finally, while the trial court did not reach the question of whether this accident resulted from Lt. Benelli's "wanton or reckless disregard for the rights and safety of others," we find that the statutory standard of proof set forth in Bourgeois, 562 So.2d at 1180-83, has been met. The evidence demonstrates that despite his consumption of at least six drinks in the preceding hours, with no food to help absorb the alcohol, the defendant nevertheless decided to drive home. The extent of his intoxication, established not only by the Bordenaves' testimony but by the blood alcohol level four hours later, would lead any reasonable person to recognize that driving a vehicle presented a substantially greater likelihood of an accident. As a police officer, presumably trained to recognize the effects of alcohol on driving abilities and exposed to the tragic accidents that frequently result, Lt. Benelli must be seen to have acted with a conscious indifference to the consequences.
For these reasons, we find the trial court's rejection of Ms. Hanson's claim for exemplary damages was manifestly erroneous. Considering the evidence presented, and acknowledging that this award "must be concentrated on deterring this defendant from this type of action, and must be based on that action's potential for harm to this victim and to others," Laris v. Parker, 92-1443, p. __ (La.App. 4th Cir.3/29/94), 635 So.2d 442, 444 (citation omitted), we conclude *640 that $10,000.00 is appropriate in this case. The judgment will be amended accordingly.

COMPENSATORY DAMAGES
When Lt. Benelli's car rammed into Ms. Hanson's car, her seat was thrown forward before it broke loose and rebounded into the back seat. She was wearing her seatbelt at the time, so her movement followed that of the car seat. Although she felt shaken, she informed the on-scene investigators she was uninjured.
When Ms. Hanson awoke the next day, however, she could barely move due to severe pain in her neck, shoulder and hip, and she had a bad headache. She went to the Methodist Hospital emergency room where x-rays were made of her neck, revealing "loss of height within the discs at C5-6 and C6-7 consistent with degenerative disc changes." A cervical collar and pain medications were prescribed, and she was referred to a neurologist for further treatment. However, Ms. Hanson was unable to make an immediate appointment due to the holidays. She wore the cervical collar constantly, and took both prescription and over-the-counter pain medications.
On January 2, 1991, Ms. Hanson was examined by Dr. Thomas A. Krefft, a neurologist. She told Dr. Krefft that she was still having severe headaches from the accident, but that her neck felt slightly better than it had a week earlier. She reported that a shoulder fracture suffered two years earlier had completely healed. Based upon a physical examination and his review of the Methodist Hospital x-rays, Dr. Krefft told Ms. Hanson she had some spurs and arthritis in the neck, possible due to a prior trauma. He diagnosed her current injury as a cervical sprain and left hip pain. Dr. Krefft continued Ms. Hanson's medications, and advised her to return in a month unless her symptoms worsened.
On January 23, 1991, Ms. Hanson consulted another neurologist, Dr. John D. Olson, who was recommended by a friend. She reported that she was having radiating pain into her arms, which sometimes woke her up, as well as numbness in her fingers. While Dr. Olson initially believed only a soft tissue injury was involved, Ms. Hanson continued to suffer severe headaches and increasing neck pain, despite medication and restricted physical activities. In April 1991, Dr. Olson detected decreased grip strength of the right hand. A subsequent EMG and nerve conduction study suggested "a right C6 radiculopathy," resulting in Dr. Olson's recommendation that she obtain an MRI scan of the cervical spine.
Because of her financial situation, Ms. Hanson did not have the MRI done until November 9, 1991. This test revealed "a slender broad-based herniation at C3/4, C4/5, C5/6 and C6/7. The most prominent of these was at C5/6 and correlated well with her EMG changes." Based upon these tests and her continuing symptoms, Dr. Olson informed Ms. Hanson that surgery might be necessary. Despite conservative treatment through July 1992, she continued to report significant neck pain and headaches.
Dr. Amilcar Correa, a neurosurgeon, examined Ms. Hanson on February 16, 1993 at Dr. Olson's request. After additional testing was completed in June 1993, Dr. Correa concluded that while the plaintiff had cervical defects at C3-4, C4-5 and C5-6, the latter herniation was the primary cause of her continued symptoms. He advised Ms. Hanson that hers was a "mechanical" problem, not a disease process, and that since her symptoms had not lessened with conservative therapy, he recommended a cervical fusion to correct the condition. She returned in March and December 1994, reporting increasing pain and numbness in the arms and continued severe headaches. Dr. Correa reiterated his opinion that she would need surgery in order to relieve the symptoms, and that he could otherwise do nothing further for her. He testified that his surgical fee would be between four and five thousand dollars.
Ms. Hanson testified that she would like to have the recommended surgery, but she was told two years ago that the hospital bill would be at least $30,000 and she has no way to pay for it.

*641 PAST MEDICAL EXPENSES
The trial court awarded $2,174.28 for past medical expenses. Ms. Hanson contends that the medical bills admitted into evidence establish that the actual cost for treatment of her injuries was $7,174.28, necessitating an increased award for this element of her damages. This claim is not challenged by the defendants, and Ms. Hanson's computation is supported by the record. Therefore, the judgment will be amended to specify that $7,174.28 is awarded for past medical expenses.

FUTURE MEDICAL EXPENSES
The trial court held that Ms. Hanson "is in need of a surgical procedure to fuse her cervical vertebra at two levels," but that no expert testimony was offered regarding the cost of that treatment. The court therefore awarded $15,000.00 for future medical care, stating this was "a minimum amount about which reasonable minds could not disagree" pursuant to Stiles v. K Mart Corporation, 597 So.2d 1012, 1013 (La.1992).
Lt. Benelli, again adopting the City's arguments on appeal, asserts that this award is unjustified because Dr. Correa stated only that a cervical fusion was "quasi-elective" for Ms. Hanson. Based upon this characterization by her own expert, and emphasizing that the plaintiff has not yet had any surgery, the defendant insists that she failed to prove that any future care was "absolutely necessary." However, if this court determines Ms. Hanson is entitled to any such damages, Lt. Benelli contends that the award of $15,000.00 was proper based upon Ms. Hanson's failure to obtain a written estimate concerning the cost.
According to Ms. Hanson, the trial court correctly determined that she needs a cervical fusion because of this accident, but erroneously rejected her sworn testimony that this surgery would cost more than $30,000.00. She therefore seeks an increased award of a least that amount for her future medical expenses.
Our review of this record reveals ample support for an award for future medical expenses. A plaintiff does not have to prove that future surgery is "absolutely necessary," but only that such care is medically necessary to correct conditions which presently exist. Hoskin v. Plaquemines Parish Government, 97-0061, pp. 4-6 (La. App. 4th Cir.12/1/97), 703 So.2d 207, 210-11. Both Dr. Olson and Dr. Correa testified unequivocally that Ms. Hanson's symptoms were caused by ruptured discs rather than a disease process, and that only surgery would relieve her pain, numbness and headaches. While both doctors indicated that Ms. Hanson was not the "ideal candidate" for a cervical fusion because more than one disc was herniated, this does not diminish the import of their testimony that surgery would be required before any improvement could be expected. Dr. Olson and Dr. Correa also testified that although Ms. Hanson said she wanted relief from her symptoms, she explained that she could not afford surgery at that time. Thus, the trial court did not err in finding that future surgery was medically necessary.
Similarly, we cannot say that the district court's award of $15,000.00 for this element of damages was manifestly erroneous on the record presented. The only direct evidence concerning the cost of a cervical fusion was Dr. Correa's estimate of $4,000 to $5,000 for his fee, and Ms. Hanson's testimony that "she was told" Chalmette General Hospital would charge $30,000 to $35,000 for that procedure. Dr. Correa was not asked about the length of hospitalization required for a fusion operation, or what other costs might reasonably be anticipated in connection with such surgery. While past medical expenses may be used to estimate future medical costs, Hoskin at pp. 7-8, 703 So.2d at 211; Rice v. ABC Ins. Co., 95-2008, p. 3 (La.App. 4th Cir.4/3/96), 672 So.2d 1109, 1112, writ denied, 96-1113 (La.6/7/96), 674 So.2d 971, Ms. Hanson's evidence of prior expenses offers little help here. There is only one De La Ronde Hospital bill from June 1993, showing that it cost $2,644.50 for an overnight stay that included charges for a myelogram and two CT scans. With such minimal evidence, we cannot say that an award of $15,000.00 was abusively low or clearly wrong. The judgment will be affirmed *642 as to the award for future medical expenses.

GENERAL DAMAGES
The trial court awarded $125,000.00 in general damages, which are intended to compensate an accident victim for "mental and physical pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other losses of lifestyle which cannot be definitively measured in monetary terms." Hoskin at p. 8, 703 So.2d at 212 (citation omitted). The factfinder has great discretion in determining the amount of such damages, which must be based upon the particular facts presented in each case. La. Civ.Code Ann. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Therefore, an appellate court cannot disturb a general damage award unless the amount is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances" established by the evidence. Youn at 1261.
Ms. Hanson was thirty-nine years old at the time of this accident. Her injury prevented her from continuing to work as a bartender, but as one-half owner of the bar, her income was reduced only by her loss of tips and by payment of a substitute employee from her share of gross earnings. In April 1993 the bar was sold, and Ms. Hanson subsequently found other sedentary employment at a higher salary than her prior earnings. At the time of trial she was voluntarily unemployed.
Ms. Hanson testified that although her headaches and neck pain are severe, she stopped taking prescription pain killers because of the expense and her fear of addiction. Both the plaintiff and her companion, Harry Darby, testified that she is no longer able to do much housework and that neck pain frequently wakes her in the middle of the night. Ms. Hanson stated she does not dance as much as she used to and that she is unable to lift things without suffering for a week. Otherwise, she said, the injury has not changed her lifestyle.
The defendant argues that this evidence demonstrates that a general damage award of $125,000.00 is unconscionably high. He asserts that Ms. Hanson's "sporadic" doctor visits, as well as her failure to take prescribed painkillers, contradict her claims of severe, continuing pain. Lt. Benelli further contends that because her wages after she sold the bar were higher than her self-employment income had been, any change in her lifestyle would be a reflection of an improved standard of living. Citing Boulmay v. Dubois, 593 So.2d 769 (La.App. 4th Cir. 1992), and Henry v. National Union Fire Ins. Co., 542 So.2d 102 (La.App. 1st Cir.), writs denied, 544 So.2d 405 (La.1989), Lt. Benelli seeks a reduction in this award to $65,000.00 or less.
Ms. Hanson maintains that the trial court's award is fully supported by the evidence and should not be disturbed. She points out that her visits to Dr. Olson reflected his decision to attempt conservative treatment, with visits every two months or so, as well as the eventual determination that only surgery could provide relief from her pain. Although she did not save all of her receipts for prescription and over-the-counter pain medications, Ms. Hanson contends that her consistent use of the recommended products is documented in the medical records admitted at trial. In addition, she suffered the pain and inconvenience of invasive testing, such as the myelogram, EMG and nerve conduction studies. Ms. Hanson argues that even though she is not seeking an award for lost earnings, the testimony concerning her physical restrictions establishes that this accident has had a substantial impact on her life and independence, thus supporting the trial court's award under these facts.
Considering the evidence presented, we cannot say that $125,000.00 is excessive compensation for the nonpecuniary losses Ms. Hanson has sustained. The trial court was in the best position to judge the sincerity of her testimony concerning the severity of her pain, and the medical evidence establishes that she will have to undergo surgery to obtain any relief. Furthermore, while Ms. Hanson might be considered fortunate in suffering *643 no loss in her earning capacity, the physical limitations resulting from this injury compelled her to give up her own business and become another's employee instead. Based upon the totality of the evidence in this particular case, it cannot be said that $125,000.00 is beyond that which a reasonable factfinder could award this particular plaintiff. Therefore, the amount of general damages will be affirmed.

CONCLUSION
For the reasons assigned, the judgment entered against the City of New Orleans is reversed, and Ms. Hanson's claims against the City are hereby dismissed with prejudice. Similarly, all claims asserted against Allstate Insurance Company are hereby dismissed with prejudice.
The judgment entered in favor of the plaintiff, Edith K. Hanson, against the defendant, David M. Benelli, is hereby amended to add $10,000.00 in exemplary damages and to correct the award for past medical expenses to $7,174.28, for a total award of $149,174.28 plus interest and costs. As amended, the judgment is affirmed.
JUDGMENT REVERSED IN PART, AMENDED IN PART, AND AFFIRMED AS AMENDED.
PLOTKIN, J., dissents in part with written reasons.
PLOTKIN, Judge, dissenting in part with written reasons:
The majority misinterprets the classic tort doctrine of vicarious liability, particularly the course-and-scope-of-employment rule. The holding violates public policy in two ways: (1) it destroys the purposes of the vicarious liability doctrine, as further explained below, and (2) it creates a large class of uninsured motorists in the metropolitan New Orleans area. The uncontradicted factual testimony, quoted at length in the majority opinion and accepted by the trial judge, overwhelmingly demonstrates that a reasonable basis exists for the trial court's finding that Lt. Benelli was in the course and scope of his employment with the New Orleans Police Department at the time of the accident which caused plaintiffs' injuries, especially when the record evidence is considered in light of all of the relevant caselaw on the subject. Thus, I respectfully dissent from the majority's decision reversing the trial court judgment imposing vicarious liability on the City of New Orleans for Lt. Benelli's tortious conduct.

I. Standard of review

This court's most recent case concerning a municipality's vicariously liability for the tortious conduct of an off-duty police officer also sets forth the standard of appellate court review of a trial court judgment on that issue. In Russell v. Noutlet, 97-0085, 97-0086 (La.App. 4th Cir.1/14/98), 706 So.2d 540, writ granted, 98-0816 (La.5/15/98), 719 So.2d 59 this court stated, in pertinent part, as follows:
The trial court's determination that a particular act is within the course and scope of employment is a factual finding governed by the manifest error/clearly wrong standard of review. The application of this standard of review mandates that an appellate court can only reverse a lower court's factual findings when (1) the appellate court finds from the record that there is no reasonable factual basis for the finding of the trial court, and (2) the appellate court further determines that the record establishes that the finding is clearly wrong (manifestly erroneous).
Id. at 543 (citations omitted). This exact same standard of review was stated by the Louisiana Supreme Court in Baumeister v. Plunkett, 95-2270 (La.1996), 673 So.2d 994, 997.
I believe that the majority's reversal of the trial court finding that the City of New Orleans was vicariously liable for Lt. Benelli's tortious acts is inappropriate both because the record contains a reasonable factual basis for the trial court's finding and because the record does not establish that the trial court's finding is manifestly erroneous. The majority's analysis improperly focuses on the factual differences between the instant case and Johnson v. Dufrene, 433 So.2d 1109 (La. App. 4th Cir.), writ denied, 441 So.2d 765 (La.1983) and never addresses the real issuesi.e. whether a reasonable factual basis *644 for the trial court's finding exists and whether the trial court's finding is manifestly erroneous. It is true that the trial judge cited Johnson in his reasons for judgment, stating that the facts of the two cases were "quite similar"; the majority obviously disagrees with that conclusion. However, a disagreement over a factual finding in the trial court's reasons for judgment is insufficient to support the reversal of a trial court judgment in the absence of a finding that no reasonable factual basis for the judgment exists and that the trial court's factual findings are manifestly erroneous. My reading of the record reveals ample reasonable factual basis for the trial court judgment, making reversal of that judgment inappropriate.

II. Louisiana law concerning course and scope of employment

The statutory basis for Louisiana's classic vicarious liability doctrine is found in La. C.C. art. 2320, which provides as follows:
Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
See also LSA-R.S. 9:3921.
Generally, an employer is considered vicariously liable for torts committed by an employee while the employee is in the "course and scope" of his employment duties. Baumeister, 673 So.2d at 996; Orgeron v. McDonald, 93-1353 (La.7/5/94), 639 So.2d 224, 226. An employee's conduct is considered to fall within the course and scope of his employment duties "if the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer." Id. at 226-27. In order for the employer to be held vicariously responsible for the torts of his employee, the employee's conduct must be "so closely connected in time, place, and causation" to the employee's employment duties "that it constitutes a risk of harm attributable to the employer's business." Id. at 227. See also Baumeister, 673 So.2d at 996. Employers generally are not considered liable for "conduct instituted by purely personal considerations entirely extraneous to the employer's interest." Id.; LeBrane v. Lewis, 292 So.2d 216, 218 (La.1974). However, the employee's conduct need only be reasonably incidental to the performance of the employee's official duties, and need not be exclusively employment rooted. Miller v. Keating, 349 So.2d 265, 269 (La.1977).
Louisiana vicarious liability doctrine is based on numerous public policy concerns, including the following considerations:
1. Employers have incentive to take steps to reduce accidents if they are liable for the negligence of their employees
2. The doctrine spreads the costs of injury to the community since an employer who has been forced to pay damages occasioned by the torts of his employees can pass on the costs to the community in the form of higher prices or costs.
3. The employer has control over the employee's activities, and should therefore be liable for the employee's torts committed while he is under the employer's control.
4. The employee's actions advance the work of the employer; thus, it is sensible and logical for the employer to be liable for the torts of his employees.
5. The employer is more likely to be solvent, and thus able to pay damages, than the employee.
The fifth policy reason listed above has been recognized across the country, as evidenced by the following quote from Henderson & Person, The Torts Process (3d ed.) (Little, Brown & Co., 1988), Chapter 3, "Vicarious Liability," 175-76:
Moreover, the concept of vicarious liability is one of considerable practical importance to the plaintiff because it is a most effective means of providing a financially responsible defendant. By far the largest class of persons to whom the rules of this chapter are applied are employers held liable for the torts of their employees. From the plaintiff's viewpoint, employers make much more desirable defendants than do employees. Not only is the jury likely to be more sympathetic to holding an employerespecially a large, corporate employerliable in the first place, but *645 they are more likely to be generous in their award of damages. And on top of everything else, employers are more likely than employees to be insured, and are more likely to be financially able to satisfy a judgment when insurance does not cover the liability. It is not surprising that of the opinions reproduced in this book, a significant percentage involve large corporate defendants.
Although the above stated legal principles govern all vicarious liability cases involving employers, a close review of the caselaw reveals two different types of analysis employed by Louisiana courts to decide course and scope of employment issues. One type of analysis is employed when the alleged tortious conduct of the employee is an intentional act, while a different analysis is applied when the alleged tortious conduct of the employee is a negligent act. Moreover, numerous Louisiana cases address the liability of a municipality for the tortious activities of off-duty police officers; a close review of those cases reveals that some unique considerations are typically employed to decide course and scope issues involving police officers. I will discuss the primary cases in each of these three categories in a effort to demonstrate the majority's error in reversing the trial court judgment in the instant case.

A. Intentional torts by employees

The two leading Louisiana Supreme Court cases concerning course and scope of employment issues when a party has allegedly been injured by an employee's intentional act are Baumeister, 673 So.2d 994, and LeBrane, 292 So.2d 216. When an intentional tort of an employee is involved, an employer is generally not considered vicariously liable "merely because his employee commits an intentional tort on the business premises during working hours." Baumeister, 673 So.2d at 996. In such a case, vicarious liability attaches "only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective." Id.
Citing LeBrane, the Louisiana Supreme Court in Baumeister listed the following factors to be considered when an employer is alleged to be liable for an intentional tort of an employee:
(1) whether the tortious act was primarily employment rooted;
(2) whether the violence was reasonably incidental to the performance of the employee's duties;
(3) whether the act occurred on the employer's premises; and
(4) whether it occurred during the hours of employment.
Id. at 996-97. See also Miller, 349 So.2d at 268. All four factors are not required for a finding of liability. Baumeister, 673 So.2d at 997. In fact, the court stated in Miller that it never intended to suggest "that in all cases of an employer's vicarious liability for the intentional torts of his employee that these four inclusive factors must be met before liability may be found." 349 So.2d at 268. "The particular facts of each case must be analyzed to determine whether the employee's tortious conduct was within the course and scope of his employment." Baumeister, 673 So.2d at 997.
Applying the above standards, in LeBrane, the Louisiana Supreme Court found that an employer was vicariously liable when a supervisor allegedly stabbed a discharged employee who was still present on the employment premises. In that case, the court found that the fight which led to the stabbing was reasonably incidental to performance of the supervisor's duties in connection with firing the employee and causing him to leave the place of employment. Additionally, in Miller, 349 So.2d 265, the court found a corporation vicariously liable for an attempted murder of a former vice-president by two corporate employees pursuant to a conspiracy involving the president of the corporation. The court found that the murder conspiracy "was in large part, although perhaps not exclusively, actuated by [the president's] desire to improve the corporation's financial picture." Id. at 269.
A similar result was reached in Benoit v. Capitol Manufacturing Co., 617 So.2d 477 (La.1993), where the court imposed vicarious liability on an employer for an machine operator's battery on a co-employee by hitting him with a broom stick during a dispute over *646 whether the door should be open or closed at the work site. The only articulated for reason for the court's holding in that case was the finding that the assault was "clearly `employment-rooted.'" Id. at 479. The court concluded as follows:
This accident took place on the employer's premises during working hours. Both employees were on a work break. They were in the course and scope of employment.
On the other hand, the Louisiana Supreme Court found in Baumeister that a hospital was not vicariously liable for damages sustained when a supervisor allegedly committed sexual assault on a clinical technician in the nurse's lounge. In so holding, the court found that the alleged assault was neither primarily employment rooted nor reasonably incidental to performance of the supervisor's duties.
As is evident from the above review of cases involving an employer's vicarious liability for the intentional torts of its employees, such liability attaches only if after a finding of a strong connection between the tortious act and the employment duties of the tortfeasor. In the absence of that strong connection, the tortious employee is considered to be pursuing purely personal motives, for which the employer bears no vicarious liability.

B. Negligent acts by employees

The test used by Louisiana courts to determine whether an employee's negligent conduct may be considered to fall within the "course and scope" of his employment duties is also a fact question. However, the factors applied by the Louisiana Supreme Court to determine an employer's vicarious liability for negligence are different from those used to determine an employer's vicarious liability for an intentional act. Those factors are listed in Orgeron as follows: (1) "the payment of wages by the employer," (2) "the employer's power of control," (3) "the employee's duty to perform the particular act," (4) "the time[,] place and purpose of the act in relation to service of the employer," (5) "the relationship between the employee's act and the employer's business," (6) "the benefits received by the employer from the act," (7) "the motivation of the employee for performing the act," and (8) "the reasonable expectation of the employer that the employee would perform the act." Id., 639 So.2d at 227, citing Reed v. House of Decor, Inc., 468 So.2d 1159 (La.1985). See also Landry v. Fincke, 98-90 (La.App. 3 Cir. 5/20/98), 1998 WL 251804, 714 So.2d 826.
Perhaps more important than the different factors applied is the fact that the Louisiana Supreme Court applies the factors much more strictly when considering vicarious liability questions involving intentional torts than it does when it determines vicarious liability questions involving negligent torts. In the intentional tort cases described in the previous section, the court imposed liability only in cases involving a strong connection between the actions of the tortfeasor employee and the employee's work responsibility. Thus, when the supervisor in Baumeister performed an act which could not be considered to be part of his work responsibility, the hospital was not vicariously liable. On the other hand, when the intentional tort arose directly from a work disputei.e., the firing in LeBrane, the murder attempt in Miller, and the determination of whether the door should be opened or closed in Benoitthe employer was considered vicariously liable.
Even a cursory review of the cases discussing an employer's vicarious liability for the negligent acts of his employees reveals that the factors are applied less precisely. For example, applying the factors listed above, the Louisiana Supreme Court found in Orgeron that a company which supplied catering services to offshore oil exploration facilities was vicariously liable for damages resulting from by an automobile accident caused by the negligence of an employee who was driving his own vehicle at his own expense to the dock where he would be transported, along with his employer's other personnel and equipment, to an offshore facility. The employee had been intercepted by his employer while on his way home after working a 14-day shift and ordered to report to a specific dock just hours later. Id. Although the court recognized the general rule that an employee travelling back and forth between *647 his home and his fixed place of work is almost never considered to be in the course and scope of his employment, it noted the necessary exceptions arising from situations where employees are dispatched to different work locations. Id. at 227. Under the circumstances presented by the case, the court found that "the risk of harm for any casualty caused by the employee during the special travel was fairly attributable to the employer." Id. at 228. Certainly the act of driving to the dock itself did not fall under the employee's work responsibilities in Orgeron, except to the extent he was required to be at a certain place at a certain time. Thus, the Orgeron case itself demonstrates the relaxation of the strict rules concerning vicarious liability in negligent tort cases as opposed to intentional tort cases.
A similar result was reached in the most recent Louisiana Supreme Court case on this issue, Landry, 714 So.2d 826, 1998 WL 251804, in which the court found that an employee of a siding company was within the course and scope of his employment when an automobile accident occurred, despite the fact he was running an errand prior to driving home. The decision in that court turned on the finding that the employer had a "heightened degree of control" over the employee, based primarily on the fact that the employee "reasonably believed he was on call within a reasonable period beyond normal business hours." Id. at 6, at 829. Moreover, the court cited the fact that the employee was furthering his employer's objective while driving down the highway by observing homes in an effort to produce leads for the company's salesmen. Id. at 7, at 830. His inattention to his driving caused by his notice of dilapidated houses along the right side of the highway was one of the reasons for the accident, the court intimated. Id. I see many parallels between the Landry case and the instant case.
Moreover, in the Louisiana Supreme Court's decision in Ermert v. Hartford Insurance Co., 559 So.2d 467 (La.1990)[1], an employer was held vicariously liable for its employee's negligent act on the basis of an even more tenuous connection to employment responsibilities than in Orgeron. In that case, the court found that a corporate president was acting within the course and scope of his employment for a fence company while he was at a hunting camp on a weekend, thus holding the fence company liable for the corporate president's negligent discharge of his shotgun, which resulted in injury to a guest at the hunting camp. Id. The court stated as follows:
The master's vicarious liability for the acts of its servant rests no so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities. In determining whether a particular accident may be associated with the employer's business enterprise courts often attempt to determine whether, considering the authority given to the employee, the employee's tortious conduct was reasonably foreseeable.... [T]he employer should be held to anticipate and allow for risks to the public that "arise out of and in the course of his employment of labor.
Id. at 476 (citations omitted). Significantly, the court found that "the assault was in large part, although perhaps not exclusively, motivated by the president's desire to improve the company's financial position." If an employee's accidental discharge of a shotgun at a location other than the workplace (i.e., the hunting camp) during a time when the employee would not ordinarily be working (i.e., the weekend) can be considered an accident which "may fairly be said to be characteristic" of the activities of a fence company, certainly Lt. Benelli's activities in the instant *648 case "may fairly be said to be characteristic" of the activities of the New Orleans Police Department, as further discussed below.

C. Negligent acts by police officers

The final category of cases concerning vicarious liability to be considered prior to a discussion of the propriety of the trial court judgment holding the City vicariously liable for Lt. Benelli's tort in the instant case is the category of cases considering a municipality's vicarious liability for the tortious actions of off-duty police officers. As the following review of Louisiana cases on that issue will show, the factual connection between the actions of the police officer and his job responsibilities in such cases can be very tenuous, but nevertheless result in a finding of liability on the part of the municipality. Such a result is logical since municipalities routinely clothe police officers with authority to take certain actionseven when they are technically off duty. In fact, municipalities frequently, as in the instant case, require that police officers take actions to deter crimes whenever and wherever they encounter situations where crimes are either being committed or are likely to be committed. Thus, it is reasonable for police officers to consider themselves to be "on call" at all times, especially if they are operating a police department vehicle.
Perhaps the Louisiana Supreme Court's lead case on this issue is also that court's most recent case on the issueRoberts v. Benoit, 605 So.2d 1032 (La.1991). In that case, as part of a favorable discussion of "Similar Torts in Other States," the court stated as follows:
[U]nder the respondeat superior doctrine, a municipal employer has been held vicariously liable for the tortious acts of its deputy when the deputy, albeit technically "off duty," is acting within the scope of his employment. 18 E. McQuillan, The Law of Municipal Corporations, Sec. 58.80 b (3d Rev. Ed.1977) (hereinafter "McQuillan"). In finding an off-duty deputy within the scope of his employment, courts have required only that the deputy be actively engaged in "police work" or performing some action furthering his police function. Collins v. City of New York, 11 Misc.2d 76, 171 N.Y.S.2d 710 (Sup.Ct. 1958), aff'd, 8 A.D.2d 613, 185 N.Y.S.2d 740, and 7 N.Y.2d 822, 196 N.Y.S.2d 700, 164 N.E.2d 719. Emphasizing the peculiar nature of a policeman's employment, courts have found factors such as the time and place of the deputy's action immaterial.
Because of the peculiar nature of the policeman's employment, the municipal employer has been held liable for injuries inflicted as a result of the officer's negligence, even where the policeman is technically off duty, for the reason that he is required by statute or regulation to be available to perform in his employer's behalf at all times, or because he is executing a function, e.g., cleaning a weapon, in furtherance of his employer's interest. The time and place of such cleaning would generally be considered immaterial.
Greenstone, Liability of Police Officers for Misuse of Their Weapons, 16 Cleve.-Mar. L.Rev. 387, 408 (1967).
Id. at 1037 (emphasis added).
In Roberts, the court found that an off-duty kitchen steward employed as a parish deputy was not in the course and scope of his employment when be negligently shot the plaintiff while engaging in horseplay with a gun, despite the fact the steward had obtained a permit to carry a concealed weapon as a result of his employment. The court found that the steward was "unquestionably acting outside the scope of his employment at the time of the tragic accident." Id. at 1041. In support of that conclusion, the court noted that neither the steward's general activities nor the specific activity which caused the harm had any connection with the furtherance of the business of the sheriff's department. "Serving a function of the sheriff's department did not actuate [the steward] to any appreciable extent," the court stated.
The most recent Louisiana case to consider this issue is Brasseaux v. Town of Mamou, 97-1540 (La.App. 3 Cir. 5/20/98), 1998 WL *649 251781, 713 So.2d 742,[2] in which the court affirmed a trial court judgment imposing liability on a municipality for an off-duty police officer, finding a reasonable basis for the trial court's finding, despite the arguments of the sheriff's office that the tortfeasor was a dispatcher, not a police officer. Moreover, the police officer was actually outside the jurisdiction of the municipality at the time of the incident. Id. Interestingly, the appellate court's discussion of the vicarious liability issue focused on the deputy's decision to "flash his badge" in an effort to break up an altercation, rather than the plaintiff's allegation that the deputy had hit him with a modified axe handle he called a "nightstick." Id. Although both the trial court and the appellate court admitted its inability to determine the part the deputy played in the events, the appellate court affirmed the trial court judgment holding the deputy and the city 50 percent liable for the plaintiff's injuries on the basis of the trial court's finding that the deputy "was present and involved in the events leading up to [the plaintiff's] injuries." Id. at 7, at 830.
Just four months prior to the Brasseaux decision, this court considered the vicarious liability of the City of New Orleans for the off-duty tortious conduct of a police officer in Russell, 706 So.2d 540. In that case, the city was held vicariously liable for injuries sustained by the plaintiff when an off-duty police officer who became involved in an altercation while drinking beer with his brothers negligently fired his weapon into a crowd. Id. Despite a finding that the police officer's decision to use deadly force on innocent bystanders was against police procedure, the court affirmed the trial court's finding of vicarious liability. Id. at 544, citing New Orleans Police Department regulations concerning "Use of Deadly Force." This court stated as follows:
Considering the principles of vicarious liability ..., it cannot be said that the trial court had no reasonable basis for concluding that [the police officer] was acting within the scope of his employment at the time the tortious injuries were inflicted. At the time the incident occurred, [the police officer] was off-duty, and the place where the incident happened was at a location where a large number of young people were gathered and drinking. As a New Orleans Police officer, [the police officer] was obligated to respond to the altercation in a manner conducive to being a police officer. Therefore, his actions in trying to quiet the disturbance was [sic] proper although the reaction by the crowd following his attempt was unexpected.
In fact, the New Orleans Police Department Operations Manual, Rule 4 Subsection 8 states, in part:
The fact that members [of the police force] may be technically off-duty shall not relieve them from the responsibility of taking the required police action on any serious police matter coming to their attention at any time.
Id. (Emphasis in original). Once again, if the New Orleans Police Department can be vicariously liable for the tortious activity of an off-duty policeman who was drinking with his brothers at a location where young people routinely gathered to drink, the department must be considered liable for Lt. Benelli's actions on the night in question, which were more closely related to his employment duties than the actions of the police officer in the Brasseaux decision.
Another example of the fact that only a minimal connection to police duties is required in order to hold a municipality vicariously liable for the tortious conduct of a police officer is Johnson v. Gantt, 606 So.2d 854 (La.App. 2 Cir.), writ denied, 608 So.2d 196 (La.1992). In that case, an off-duty probationary police office unlocked and entered a locked police station with two friends in order to use the telephone and to get live or fired cartridges for his pistol before preceding to his home, where there was no telephone. Id. The two friends had previously met him at the station after his shift and they had engaged in social activities for several *650 hours, before the group returned to the police station to retrieve the friends' vehicles. Id. While engaging in friendly talk on the telephone with a woman who had been the subject of an earlier investigation out side the jurisdiction of the police district, the police officer took his police revolver out of his holster and started "manipulating" it. Id. At that time, the revolver fired, striking one of the police officer's friends in the face, killing him instantly. Id.
In affirming the trial court judgment holding the municipality vicariously liable for the police officers tortious conduct in Johnson, the court found specifically that the police officer was "on call," and that the police officer's supervisor "effectively sanctioned" the telephone call from the station; thus, the court found that the police officer was within the course and scope of his employment at the time of the accidental shooting.
The other important case on this issue vitally important to the majorityis this court's opinion in Johnson, 433 So.2d 1109. In that case, the court held that a police officer was within the course and scope of his duties when the police vehicle he was driving rearended the plaintiff's vehicle. At the time the accident occurred, Officer Dufrene was driving his mother-in-law home after his brother-in-law's birthday party. After stating the general principles governing the determination of an employer's vicarious liability in general, this court stated as follows:
In those instances where the injury is caused by an employee's negligence while driving a vehicle owned by his employer, our jurisprudence has repeatedly stated that every case must be decided on its own facts. The important considerations which bear on the result are whether the vehicle was being used in such a manner as to benefit the employer, whether the employee was subject to the employer's control at the time of the accident, whether the employee's use of the vehicle was authorized by the employer, and whether the employee's motive arose from personal objective or, instead, from his employer's concerns.
Id. at 1112 (bold emphasis added; italic emphasis in original). I would submit that application of the above factors to uncontested factual evidence in the instant case can only result in a finding that the City of New Orleans is vicariously liable for the tortious acts of Lt. Benelli in the instant case. The majority fails to properly focus on the factors cited by the Johnson court for deciding the vicarious liability issue, focusing instead on factual differences, despite the clear language in that case requiring each case to "be decided on its own facts." Id. This issue is discussed more fully below.

III. Application to facts of case

Both the trial court judgment and the majority decision in the instant case focus on the Johnson decision, indicating that the Johnson decision established the standard for determining the vicarious liability issue in the instant case. As outlined above, the Johnson case is not the most recent Louisiana case on the issue of a municipality's vicarious liability for the tortious conduct of a police officer. However, I am willing to concede that most of the more recent cases involve accidental shootings, which do involve a different type of analysis given the fact that the possession of firearms by a police officer is typically considered incidental to his employment. Thus, I too will focus on the Johnson decision in setting forth my specific reasons for disagreeing with the majority's conclusion.
First, I believe that the majority improperly focuses on Lt. Benelli's attendance at the various social events between 6 p.m. and 2 a.m., prior to the occurrence of the accident which caused the plaintiff's injuries. The majority's reasoning ignores the fact that the event giving rise to the plaintiff's injuries did not occur during any of the parties; instead, the plaintiff's injuries resulted from an accident which occurred after Lt. Benelli left the parties. I believe the relevant focus is Lt. Benelli's decision to drive the police car, as opposed to his personal vehicle. Johnson, 433 So.2d at 1112. Specifically, the court should consider the following factors, which are set forth in Johnson:
1. Whether the vehicle was being used in such a manner as to benefit the employer.

*651 2. Whether the employee was subject to the employer's control at the time of the accident.
3. Whether the employee's use of the vehicle was authorized by the employer.
4. Whether the employee's motive arose from personal objective or, instead, from his employer's concerns.
Id.
Instead of focusing on the application of the above factors to the facts of the Johnson case, the majority elects to focus on purely factual differences between the two cases. Such a focus is inappropriate, as I have already intimated, because each case is to be decided on its own facts, not on a comparison of its facts to facts of other cases. Id. In fact, that principle is intimately associated with the recitation of the above factors in the Johnson decision, as demonstrated by the above quote. It is true, as the majority points out, that the record in the Johnson case indicated that Sergeant Dufrene was uniquely important to the New Orleans Police Department at the time of the accident in question; moreover, the record evidence in the instant case does not demonstrate any similar uniqueness concerning Lt. Benelli's duties for the department. However, the uniqueness of the police officer's activities is not the standard for deciding the vicarious liability issue.
The application of the unique facts of the case to the factors set forth for determining vicarious liability is the pertinent method of deciding the issue, not comparison of unique facts between cases. In determining that the police department was liable for the police officer's tortious conduct in Johnson, the court applied the factors listed as follows:
The foregoing facts compel the conclusion that at the time of the collision, Sergeant Dufrene was acting within the course and scope of his employment. It does not stretch the meaning to say that Dufrene conferred a "benefit" to his employer every time he rode in his own police car rather than, for instance, his wife's personal automobile. By virtue of the car's police radio, he was accessible, and his accessibility was deemed vitally necessary to the N.O.P.D. in the performance of its most important functions. Similarly, driving the police car even while on personal missions was itself a part of Dufrene's duty to remain "on call" and subject to his employer's control. Thus, it cannot be said that Sergeant Dufrene's mission was purely personal. Being "on call" at all times, he was therefore duty-bound to use his police car rather than another, and in carrying out that duty, he performed a function of his employment.

Id. at 1113 (emphasis added). I respectfully submit that virtually the same statements made above concerning Sergeant Dufrene could be made concerning Lt. Benelli in the instant case. Thus, the trial court judgment has a reasonable basis.
At the time of the accident, Lt. Benelli was Platoon Commander of the Second Platoon, Fifth District, New Orleans Police Department; he was subject to call at all times because of his supervisory status. According to Lt. Benelli's uncontradicted testimony, he considered himself to be "on duty" with the police department 24 hours a day, seven days a week. In view of the requirement that he be accessible to the New Orleans Police Department at all times, Lt. Benelli carried a beeper, as well as his police credentials, at all times. In fact, he was mandated to carry his police credentials at all times. Moreover, Lt. Benelli testified that he always carried a portable radio in his car because it served as a "vital link of communication."
The New Orleans Police Department requires its employees to respond appropriately any time they see a crime in progress while driving a police vehicle, Lt. Benelli stated. The police vehicle in question was assigned to him, for his exclusive use on both departmental business and personal business, he said. In fact, Lt. Benelli stated, police officers were encouraged to drive their police vehicles as much as possible when technically off duty because the presence of police vehicles on the streets acted as a proven deterrent to crime. Police officers are commissioned 24 hours a day, Lt. Benelli asserted; he considered himself to be in the course and scope of his employment with the New Orleans Police Department at the time of the accident. Although they had listed witnesses *652 in the pre-trial order, the City of New Orleans offered no testimony from any New Orleans Police Department official that the policy and regulations described by Lt. Benelli were inaccurate or untrue.
Applying the Johnson factors to the proper question in this casewhether Lt. Benelli's decision to drive the police vehicle was within the course and scope of his employmentshows that the trial court decision finding that Lt. Benelli was within the course and scope of his employment at the time of the accident has a reasonable basis and was not manifestly erroneous. First, the evidence indicates that Lt. Benelli's decision to use his police vehicle provided a benefit to his employer; in fact, it is difficult to imagine a more important benefit to a police department than deterrence of crime.[3] Second, Lt. Benelli, who testified that he considered himself "on call" at all times based on the requirement that he respond to police situations, was subject to the control of the police department at the time of the accident; the fact that he had locked his police radio in his trunk, most likely for security purposes, does not detract from the fact that he reasonably believed that he was "on call" 24 hours a day. Third, Lt. Benelli was unquestionably authorized to use the police vehicle, which had been specifically assigned for his exclusive use; in fact, he was encouraged to use the vehicle at all times because of its deterrent effect.[4] Fourth, Lt. Benelli's decision to drive the police car, rather than his personal vehicle, arose from his employer's concerns i.e. deterrence of crimerather than his own personal objectives.
Moreover, I would submit that even Lt. Benelli's presence at the social events earlier in the evening were related to his duties as a New Orleans police officer. All of the social events had been sponsored by persons and organizations associated, either formally or informally, with the department. Both Lt. Benelli's invitation to the parties and his attendance of the parties were related to his status as a police officer; in other words, had he not been a police officer, he would not have been invited to or attended the parties.
In distinguishing the instant case from Johnson, the majority looks to the different factual circumstances, without giving proper deference to the trial court's findings based on the obvious similarities between the two cases. In both cases, the police officer in question was preforming a personal errand while driving a police department vehicle. In both cases, the tortfeasor considered himself to be "on call" 24 hours a day. Moreover, like the tortfeasor in Johnson, the police officer in this case occupied a position of special responsibility at the police station, which he testified required his constant accessibility. The fact that the record contains no evidence that Lt. Benelli is the only police department employee required to perform certain tasks, like the tortfeasor in Johnson, should not be the determining factor in the instant case. Such a requirement has never been imposed in the analysis of whether an employee is in the course and scope of his employment; it was simply one of many relevant factors in the Johnson case.
The majority points to the fact that independent evidence corroborated the testimony of the police officer in the Johnson case that he needed to be available to the police department 24 hours a day; however, that testimony does not make this case distinguishable. As I have stated numerous times, Lt. Benelli's testimony was uncontradicted. Unquestionably, the City of New Orleans had an opportunity to present contradictory evidence. In fact, the City had actually listed *653 several rebuttal witnesses on the pre-trial order. None of those witnesses testified; the reason for their failure to testify is not addressed by the record.
As shown by the above application of the Johnson factors, Lt. Benelli's decision to use the police vehicle placed him squarely within the course and scope of his employment duties at the time of the accident in question in the instant case. Obviously, since the police department requested that Lt. Benelli use the police vehicle as much as possible on personal business, the risk that a police officer who is technically "off duty" will commit a tort while driving that police vehicle may be fairly attributed to the police department's business.
The majority asserts that affirming the trial court judgment in this case requires that this court "hold that a New Orleans police officer is in the course and scope of his employment as a policeman whenever he is involved in an accident driving a car owned by NOPD." (Emphasis in original.) I vehemently disagree with that statement, but recognize that the majority must make such a statement in order to justify its reversal of the trial court judgment. As the cases reviewed state repeatedly, the issue is extremely fact sensitive. Thus, determination of vicarious liability can never turn on the presence or absence of a specific fact without consideration of the other facts in the case. The trial court's judgment does not establish such a rule; thus, an affirmation of the trial court judgment would not establish such a rule.
Moreover, the majority acknowledges the impact of its holding, noting the fact that its decision results in a fleet of uninsured automobiles on New Orleans streets. I would note that the problems created by the decision are not limited to off-duty New Orleans Police officers driving city-owned vehicles, but extends to all other self-insureds who provide vehicles to their employees. The majority sees this result as a political, rather than a legal, problem. I respectfully disagree. The problem is purely legal; moreover, it calls for a legal solution. Obviously, the legislative policy in Louisiana is for all motorists to be insured; the primary purpose behind that policy is the desire to protect the motoring public. Thus, Louisiana courts should interpret cases in a manner which serves that clear public policy concern. In this case, it find it ironic that the problem is created, not by a defect in legislation, but by the majority's own improper application of the law.
In summary, I believe that the trial court judgment imposing vicarious liability for the tortious conduct of Lt. Benelli on the City of New Orleans has a reasonable basis and is not manifestly erroneous. Thus, I would affirm and amend to include the punitive damages awarded by the majority.
NOTES
[1] Ms. Hanson has also used the surname of her longtime companion, Harry J. Darby, Jr.
[2] Ms. Hanson also sued Aetna Insurance Company as her UM insurer, but this claim was settled and dismissed prior to trial.
[3] These witnesses were not yet married at the time of this accident.
[4] Lt. Benelli also testified he worked 3:00 p.m. to 11:00 p.m. during the month of December. He, therefore, apparently was not scheduled to be on duty until 3:00 p.m. on December 21, the day of the accident.
[5] For example, the first party was at the law offices of PANO's attorney.
[6] In fact, the witnesses who spotted Lt. Benelli's erratic driving before he rammed into Ms. Hanson recognized it as being a police car.
[1] The Ermert case is unusual in two respects: (1) it involves the tortious conduct of an executive officer rather than a lower echelon employee like most vicarious liability case, and (2) the opinion addresses liability for intentional acts of an employee, despite the fact the shooting is characterized as "accidental." Despite these two difficulties in interpreting the case, it nevertheless demonstrates both the fact that vicarious liability cases are extremely fact sensitive and the fact that the connection between the actions of the employee and the finding of "course and scope" is not always as clear cut as the majority seems to imply.
[2] In deciding this case, the court listed the factors established by LeBrane to determine vicarious liability for intentional acts, rather than the factors listed in Orgeron to determine vicarious liability for negligent acts, presumably because the alleged tortious act was police officer's hitting the plaintiff with a modified axe handle he called a "nightstick."
[3] The majority asserts that "Lt. Benelli's use of the unmarked police car at the time of this auto accident provided no particular benefit to the NOPD beyond it possible effect as a deterrent to crime." I don't necessarily disagree with that assertion; however, I believe that crime deterrence is central to the function of a police department. Thus, a finding that the use of the vehicle as a deterrent to crime is, in my view, more than sufficient to fulfill the first prong of the Johnson analysis.
[4] The majority denigrates Lt. Benelli's testimony that the vehicle was readily identifiable as a police vehicle on the basis of the uncontested fact that it was an "unmarked" unit. However, the majority's own statement of fact records that the two eyewitnesses stated that they believed the vehicle was an unmarked police car "because of the make, color, and model, even before they saw the public license plate or the uniform hanging in the backseat." Opinion, page 630.